Argued and submitted November 3, 1993, accused suspended from office without pay for a period of 45 days commencing on the effective date of this decision as decided March 10, reconsideration denied April 28, 1994

## In re Complaint as to the Conduct of

### The Honorable
### RONALD D. SCHENCK,
*Accused.*

### (JFC 91-119; SC S40197)

870 P2d 185

Ronald D. Schenck, La Grande, *in pro per*, argued the cause and filed the briefs.

Ronald L. Marceau, Bend, argued the cause and filed the brief on behalf of the Commission on Judicial Fitness and Disability.

Thomas M. Christ, Portland, filed a brief *amicus curiae* on behalf of the ACLU Foundation of Oregon, Inc.

Before Gillette, Presiding Justice, Van Hoomissen and Unis, Justices, and Richardson and Warren, Justices pro tempore.

PER CURIAM

Unis, J., specially concurred in part and dissented in part and filed an opinion.

## PER CURIAM

This judicial discipline case is before the court on mandatory direct and *de novo* review of the Findings of Fact, Conclusions of Law and Recommendation of the Commission on Judicial Fitness and Disability (Commission).[1] The Commission issued a complaint and notice of institution of formal proceedings against Ronald D. Schenck, a judge of the circuit court of the State of Oregon for Union and Wallowa Counties (the Judge), alleging that he had violated several canons of the Oregon Code of Judicial Conduct (the Code). After a hearing, the Commission found that the Judge had violated certain canons in several respects, and recommended that he be suspended from office without pay for three months.

The Commission concluded that the Judge had wilfully violated Canons 1, 2A, and 3C(1) when he refused to disqualify himself in cases in which his impartiality might reasonably be questioned, that the Judge had wilfully violated Canons 1, 2A, and 3A(4) when he initiated *ex parte* communications concerning pending or impending cases, and that the Judge had wilfully violated Canons 1, 2A, and 3A(6) when he made public comments in a letter to the editor and in a guest editorial about pending or impending cases and about the District Attorney of Wallowa County.[2] After discussing the law that applies generally to each canon that the Commission concluded the Judge had violated, we will consider each of the Commission's conclusions in turn.[3]

---

[1] The Commission has jurisdiction in this proceeding pursuant to ORS 1.410 *et seq* and Article VII (Amended), section 8(1), of the Oregon Constitution. The Supreme Court may censure, suspend, or remove the judge from office. Or Const, Art VII (Amended), § 8(1); ORS 1.430(1). The Commission has no independent authority to discipline a judge. *See In re Fadeley*, 310 Or 548, 553-55, 802 P2d 31 (1990) (history of the Commission and the Oregon Code of Judicial Conduct).

[2] The full texts of the Judge's letter to the editor and guest editorial are found in the appendix to this opinion.

[3] The Commission also concluded that there was not clear and convincing evidence that Judge Schenck had wilfully violated the Code in several other respects charged in the complaint. Although this court reviews the entire record of the proceedings under ORS 1.420 on the law and facts and may receive additional evidence, ORS 1.430(1), in this case we will review only those causes of complaint against the Judge that resulted in a conclusion by the Commission that the Judge wilfully violated a canon of the Code. *See In re Gustafson*, 305 Or 655, 756 P2d 21 (1988) (reviewing only those causes of complaint for which the Commission had found a wilful violation).

## STANDARDS FOR REVIEW AND DISCIPLINE

Article VII (Amended), section 8(1)(e), of the Oregon Constitution, provides in part:

"(1) In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court may be removed or suspended from his judicial office by the Supreme Court, or censured by the Supreme Court, for:

"* * * * *

"(e) Wilful violation of any rule of judicial conduct as shall be established by the Supreme Court * * *[.]' "

Consistent with this constitutional recognition of its authority, the Supreme Court has adopted the Code. *See In re Fadeley*, 310 Or 548, 560-61, 802 P2d 31 (1990) (holding that the constitutional provision carried with it the acknowledgement of preexisting rules regulating judicial conduct). The canons of the Code at issue in this case were in effect at all material times.

■ This court reviews *de novo* the Commission's findings, conclusions, and recommendation. ORS 1.430(1); *In the Matter of Field*, 281 Or 623, 627-28, 576 P2d 348 (1978). In order to conclude that there had been a wilful violation of a rule of judicial conduct established by this court, we must find clear and convincing evidence of a wilful violation. *See In re Gustafson*, 305 Or 655, 668, 756 P2d 21 (1988) (applying that standard); *In the Matter of Field, supra*, 281 Or at 629 (same).

■ In *In re Gustafson, supra*, 305 Or at 660, this court held:

"[A] judge's conduct is 'wilful' within the meaning of Article VII (Amended), section 8, if the judge intends to cause a result or take an action contrary to the applicable rule and if he is aware of circumstances that in fact make the rule applicable, whether or not the judge knows that he violates the rule."

The intent required is simply an intentional act, defined as an act done with "the conscious objective of causing the result or of acting in the manner defined in the rule of conduct." *Id.*

### CANONS 1 AND 2A

Canon 1 provides:

"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in

establishing, maintaining and enforcing, and should observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.''

## Canon 2A provides:

''A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.''

With respect to each violation of Canon 3, the Commission found, without discussion, concomitant wilful violations of Canons 1 and 2A. We conclude that the violations of Canon 1 stand or fall with the conclusions respecting the violations of Canon 3. The same also is true of the violations of Canon 2A, with the exception of the alleged violation of Canon 3A(6), where Canon 2A will be discussed separately below.

## CANON 3C(1)

### Canon 3C(1) provides:

''A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

''(a) the judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceedings;

''(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously was associated served during such association as a lawyer concerning the matter or the judge or such lawyer has been a material witness concerning it;

''(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or is a party to the proceeding, or have any other interest that could be substantially affected by the outcome of the proceeding;

''(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

''(i) is a party to the proceeding, or an officer, director or trustee of a party;

"(ii) is acting as a lawyer in the proceeding;

"(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

"(iv) is, to the judge's knowledge, likely to be a material witness in the proceeding."

The general standard of conduct stated in the first clause of Canon 3C(1) expressly includes, but is not limited to, the four particular instances listed in Canon 3C(1)(a)-(d).

The purpose and importance of Canon 3C(1)'s admonition, *viz.*, "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned * * *," should be evident, because not only the fact but also the appearance of impartiality are the very currency of judicial legitimacy. *See In re Fadeley, supra,* 310 Or at 563 ("The stake of the public in a judiciary that is both honest in fact and honest in appearance is profound. A democratic society that, like ours, leaves many of its final decisions, both constitutional and otherwise, to its judiciary is totally dependent on the scrupulous integrity of that judiciary."); *see also* Code of Judicial Conduct, Canon 2A ("A judge should * * * act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."); Abramson, *Judicial Disqualification under Canon 3 of the Code of Judicial Conduct* vii, 15 & n 26 (2d ed 1992) (the appearance of impartiality is important to developing public confidence in the judiciary). Indeed, the rules of judicial conduct are fashioned, in part, for the purpose of maintaining public confidence in the legal system, by imposing a system of ethical restraints that will further both the fact and the appearance of a system committed to providing equal justice under law. Abramson, *supra,* at 1, 15.

With the foregoing principles in mind, we consider each of the four cases in which the Commission concluded that the Judge had wilfully violated Canons 1, 2A, and 3C(1) when he refused to disqualify himself.

A. *The Hopkins juvenile case*

In 1989, Karen Hopkins pleaded guilty to charges of sodomy in the first degree and sexual abuse in the first degree,

involving one of her two children. She was placed on probation with several special conditions. In August 1990, Children's Services Division (CSD) filed a dependency petition in juvenile court with respect to Hopkins' children. ORS 419.476(1)(d). Her children were placed in CSD's temporary custody. Periodic status reports filed by CSD stated that CSD's goal was to return the children to their parents.

The Judge took office as a circuit judge in January 1991. In April 1991, Hopkins was charged with violating a term of her criminal probation that required her to participate in a treatment program for sexual offenders. The Judge presided over that probation violation hearing. In September 1991, he issued a written opinion in which he concluded that Hopkins had not wilfully violated her probation. That opinion also stated:

> "The Court is convinced that insofar as her children are concerned, this young woman, will not, in the foreseeable future, be able to participate in their lives, or to have any relationship with them whatsoever.
>
> "* * * * *
>
> "CSD should move to develop a permanent plan for the placement of [Hopkins'] children, which does not include contact with [Hopkins]. Termination of parental rights should be pursued."

Between September 4, 1990, and October 24, 1991, no hearings were held, no petitions were filed, and the court made no rulings in the Hopkins juvenile case. The children remained in CSD's custody subject to further order of the court. ORS 419.577(1)(e).

On October 25, 1991, Hopkins received notice that a juvenile court hearing was scheduled for November 6, 1991, before the Judge, for "adjudication and disposition" of her children's juvenile dependency case. That same day, through her lawyer, Bruce Anderson, Hopkins moved to disqualify the Judge pursuant to ORS 14.250 *et seq.*[4] In her affidavit, Hopkins stated in part:

---

[4] ORS 14.250 provides in part:

"No judge of a circuit court shall sit to hear or try any suit, action, matter or proceeding when it is established, as provided in ORS 14.250 to 14.270, that any

"I believe that my children and I cannot have a fair and impartial hearing before [the Judge] and request that he be disqualified from hearing or determining any issues or facts in this matter."

That same day, the Judge denied Hopkins' motion, writing "Denied not timely" on the motion.

On October 28, 1991, Anderson met with the Judge concerning the denial of Hopkins' disqualification motion. Anderson sent the judge a confirming letter the next day. In the meeting and in the letter, Anderson relied, not only on Hopkins' affidavit filed under ORS 14.260(1), but also on the ground that the Judge was *actually* biased toward Hopkins. Pointing specifically to the Judge's written opinion in Hopkins' probation revocation case, Anderson further asserted

---

party or attorney believes that such party or attorney cannot have a fair and impartial trial or hearing before such judge. * * *"

ORS 14.260 provides in part:

"(1) Any party to or any attorney appearing in any cause, matter or proceeding in a circuit court may establish the belief described in ORS 14.250 by motion supported by affidavit that such party or attorney believes that such party or attorney cannot have a fair and impartial trial or hearing before such judge, and that it is made in good faith and not for the purpose of delay. No specific grounds for the belief need be alleged. Such motion shall be allowed unless the judge moved against, or the presiding judge in those counties where there is one, challenges the good faith of the affiant and sets forth the basis of such challenge. In the event of such challenge, a hearing shall be held before a disinterested judge. The burden of proof shall be on the challenging judge to establish that the motion was made in bad faith or for the purposes of delay.

"(2) The affidavit shall be filed with such motion at any time prior to final determination of such cause, matter or proceedings in uncontested cases, and in contested cases before or within five days after such cause, manner or proceeding is at issue upon a question of fact or within 10 days after the assignment, appointment and qualification or election and assumption of office of another judge to preside over such cause, matter or proceeding.

"(3) No motion to disqualify a judge shall be made after the judge has ruled upon any petition, demurrer or motion other than a motion to extend time in the cause, matter or proceeding. No motion to disqualify a judge or a judge pro tem, assigned by the Chief Justice of the Supreme Court to serve in a county other than the county in which the judge or judge pro tem resides shall be filed more than five days after the party or attorney appearing in the cause receives notice of the assignment.

"* * * * *

"(5) No party or attorney shall be permitted to make more than two applications in any cause, matter or proceeding under this section."

The Judge did not challenge Hopkins' good faith or the sufficiency of her affidavit under ORS 14.260(1), nor had Hopkins made any prior motion to disqualify any judge in the juvenile case, ORS 14.260(5).

that the Judge's disqualification in the juvenile cases was required by Canon 3C(1). Anderson noted that the district attorney, who represented the Union County Juvenile Department in the Hopkins juvenile case, joined in the request that the Judge disqualify himself. The Judge refused to postpone the November 6 juvenile court hearing, telling Anderson that the hearing would be on the issue of the Judge's disqualification and that he would preside over the hearing.

On October 29, 1991, Anderson filed a complaint with the Commission, alleging, *inter alia*, that the Judge had violated Canon 3C(1) when he refused to recuse himself in the Hopkins juvenile case. On October 30, 1991, the Judge and Anderson had a telephone conversation regarding the Hopkins juvenile case during which the Judge asked Anderson, "Who in the hell made you God's gift to the legal profession?"

On November 5, 1991, the presiding judge of the judicial district in which the Judge serves ordered that the scheduled November 6 hearing in the Hopkins juvenile case be postponed and that the issue of the Judge's disqualification in that case be submitted to another judge.[5] Notwithstanding the presiding judge's order, the Judge refused to postpone the November 6 hearing. He told the parties that they would be in contempt if they did not attend the hearing. On November 6, the Judge convened a hearing at which only a representative of CSD appeared. No action was taken, however, and the Judge continued the case until December 4, 1991.

On November 8, the Judge sent a letter to each member of the Union and Wallowa County Bar Associations, enclosing a copy of Anderson's complaint to the Commission, and characterizing the complaint as "pathetic" and "a petulant response."

On November 14, 1991, Anderson wrote to the Judge about the December 4 setting of the Hopkins juvenile case. In his letter, Anderson stated in part:

---

[5] *See generally* ORS 3.065 (presiding judge's role). The questions of the presiding judge's authority to postpone the hearing and whether the disqualification motion should have been heard by another judge were not resolved by this court in *State ex rel Hopkins v. Schenck*, 313 Or 529, 836 P2d 721 (1992) (discussed in text, *infra*).

"When I last attempted to discuss the Hopkins case with you on the morning of November 6th, you openly cursed me and my methods of practicing law. I suppose that is an understandable reaction to my October 29th filing of a Judicial Fitness Commission Complaint against you. * * * Under the circumstances, I believe it is even more appropriate now than on October 25th that you disqualify yourself from this matter."

On November 25, 1991, Hopkins petitioned this court for a writ of mandamus, seeking to require the Judge to vacate his October 25 order denying Hopkins' motion to disqualify him, as well as to require the Judge to recuse himself or set a hearing before another judge on the question whether the Judge should be disqualified in the juvenile case. The Union County District Attorney, representing the Union County Juvenile Department, joined in that petition. This court stayed the juvenile cases and issued an alternative writ of mandamus.

On July 9, 1992, this court issued an opinion directing that a peremptory writ of mandamus issue requiring the Judge to vacate his order denying Hopkins' motion to disqualify him, and to grant Hopkins' motion. This court held that Hopkins had timely filed her motion to disqualify the Judge and that, because the Judge had not challenged Hopkins' good faith in filing the motion, he had a duty to grant the motion pursuant to ORS 14.260(1). *State ex rel Hopkins v. Schenck*, 313 Or 529, 538-39, 836 P2d 721 (1992). *See also State ex rel Kafoury v. Jones*, 315 Or 201, 205, 843 P2d 932 (1992) (generally, a timely motion under ORS 14.260 must be granted, absent bad faith or purpose of delay). In this case, the Commission later concluded that the Judge wilfully violated Canon 3C(1) by not disqualifying himself in the Hopkins juvenile case before the peremptory writ of mandamus issued.

■ This court has held that there are two predicates for a "wilful violation" of a rule of judicial conduct established by this court, each of which is necessary for there to be a wilful violation: (1) that the judge must intend "to cause a result or take an action contrary to the applicable rule" of judicial conduct, and (2) that the judge must be "aware of circumstances that in fact make the rule applicable, whether or not

the judge knows that he violates the rule." *In re Gustafson, supra*, 305 Or at 660. In this case, we conclude that the Judge's error of law in denying Hopkins' October 25, 1991, disqualification motion on timeliness grounds does not, in and of itself, satisfy either predicate necessary to establish a wilful violation.

Hopkins' ORS 14.260 disqualification motion relied solely on her affidavit asserting Hopkins' statutorily-required belief that "my children and I cannot have a fair and impartial hearing before [the Judge] and request that he be disqualified from hearing or determining any issues or facts in this matter." No mention was made in the affidavit about the Judge's written opinion from the Hopkins' probation violation hearing. The Judge did not challenge Hopkins' good faith in filing the motion. ORS 14.260(1). On this record, we conclude that there is not clear and convincing evidence that, when he denied Hopkins' ORS 14.260 motion on timeliness grounds, the Judge was consciously aware of the specific underlying basis for the bare assertion made in Hopkins' affidavit. Consequently, there is insufficient proof that on October 25, 1991, the Judge was aware of circumstances that made Canon 3C(1) of the Code applicable in the Hopkins juvenile case.

■■■ Moreover, even assuming the erroneous denial of Hopkins' disqualification motion on timeliness grounds, without more, that is not an "action contrary to the applicable rule of judicial conduct." Canon 3C(1) admonishes judges to disqualify themselves in cases in which their impartiality reasonably might be questioned. Ordinarily, a judge may deny a basic statutory disqualification motion on the ground that it is untimely, pursuant to ORS 14.260 or 14.270, without thereby becoming subject to discipline under Canon 3C(1). The bare assertion in an affidavit of a belief that the party or lawyer cannot receive a fair hearing before a judge, without more, is not a basis for a finding based on clear and convincing evidence that the judge is improperly going forward to adjudicate a case in which the judge's impartiality might reasonably be questioned. By the same token, a judge may errantly deny a basic statutory disqualification motion on timeliness grounds if the judge reasonably believes that

the motion is untimely, without the erroneous legal conclusion on the issue of timeliness, by itself, implicating Canon 3C(1).

We conclude that there was nothing sanctionable in the Judge's behavior in denying Hopkins' October 25, 1991, ORS 14.260 motion on timeliness grounds.

■ On October 28-29, 1991, however, Anderson followed up Hopkins' original motion to disqualify the Judge with an assertion of *actual* bias and a reference to Canon 3C(1), pointing specifically to the Judge's earlier opinion in the Hopkins probation revocation case. The Judge does not dispute that fact. From that fact, there is clear and convincing evidence that on and after October 28, 1991, the Judge was aware of circumstances that in fact made Canon 3C(1) applicable in the Hopkins juvenile case. However, that satisfies only one of the two predicates for a wilful violation of the canon.

Although we assume for the sake of discussion that the Judge ultimately should have recused himself in the Hopkins juvenile case pursuant to Canon 3C(1), we conclude that there is not clear and convincing evidence of the other necessary predicate, *viz.*, that the Judge intended to cause a result or take an action contrary to the applicable rule of judicial conduct.

The record shows that the Judge scheduled a hearing for November 6, 1991, specifically to consider the question of his disqualification based on Anderson's October 28-29 assertion of actual bias and his reliance on Canon 3C(1). On November 5, 1991, the presiding judge ordered that the November 6 hearing be postponed and that the issue of the Judge's disqualification be submitted to another judge. The Judge, however, did not consider that order to be valid, and he attempted to hold a hearing on November 6 on the question of his disqualification for alleged actual bias. Neither Hopkins nor Anderson appeared on November 6, and the juvenile case was continued to December 4. On November 25, 1991, Hopkins filed a petition for a writ of mandamus in this court, and this court thereupon stayed the juvenile case pending the resolution of that mandamus action. Ultimately, this court concluded that Hopkins' October 25 disqualification motion

was timely and should have been granted. *State ex rel Hopkins v. Schenck, supra,* 313 Or at 538-39. Thus, the Judge in fact never ruled on the questions of his alleged *actual* bias and the applicability of Canon 3C(1) to the *Hopkins* juvenile case.

Under those circumstances, we conclude that there is not clear and convincing evidence that the Judge consciously intended to cause a result or take an action contrary to Canon 3C(1). The Judge took actions that he believed were consistent with trying to resolve the question of his disqualification for alleged actual bias and the applicability of Canon 3C(1). Because of the presiding judge's intervening order and then the mandamus action, a disposition of the disqualification issue on the merits was never made by the Judge. Contrary to the conclusion of the Commission, we are not persuaded that there is clear and convincing evidence that the Judge wilfully violated Canon 3C(1) in the *Hopkins* juvenile case.

## B. *The Roper case*

■ On November 27, 1991, lawyer Anderson, who also represented a party in the case of *Roper and Roper,* moved to disqualify the Judge. The motion cited Canon 3C(1) and was based on the relationship between Anderson and the Judge described above. The Judge denied the motion as untimely under ORS 14.260. However, at a hearing on the disqualification motion, the Judge addressed the question of disqualification under Canon 3C(1), concluding that he was not biased against either Anderson or his client.[6] The Judge further stated:

> "As far as your personal position with me, Mr. Anderson, I have told you before and I'll tell you again here in open court, that we may dispute and we may dispute vociferously what law applies to a certain case, what procedure should be applied, and how that case should be handled. And I may, at least outside this courtroom, very strongly read the riot act to you. And that is not an indication that I cannot sit on your cases or anybody else's and be fair and impartial. You're going to — you're going to have to be mature enough to take

---

[6] The Commission's decision is based on a violation of Canon 3C(1) (impartiality might reasonably be questioned), not on a violation of Canon 3C(1)(a) (actual personal bias or prejudice).

my responses to you, no matter how vociferously or energetically given, without reading into them any personality contest or other matter that would interfere with my ability to sit on cases that you present and be fair and impartial.

"I will not allow you or anyone else, any attorney, to disrupt the administration of the court. I think you have in the past taken the proper procedures to challenge my rulings and you are entitled to challenge my rulings * * * in the proper manners, through the proper procedures, with the appellate courts, mandamus, or appellate actions, and I can — you know that's fine, that's part of the process. That is part of the system in which we both work. I have in this case no — no problems with regard to the Canons of Judicial Conduct. I simply do not believe that I have, in any way, shape or form, or will in any way, shape or form, by denying your motion to disqualify, violate any Canon of Judicial Conduct."

The question is whether *Roper and Roper* was a case in which the Judge's impartiality might reasonably be questioned, such that he should have disqualified himself. The Commission stated:

"The Commission does not believe that Canon 3C requires a judge to be disqualified merely because an attorney has filed a complaint against the judge with the Commission on Judicial Fitness and Disability. To do so would create an opportunity for attorneys to remove judges from cases even where there did not exist a reasonable basis for questioning impartiality. Similarly, the Commission does not believe that harsh words between a lawyer and a judge necessarily require recusal. However, where the judge takes affirmative action to make public the dispute between an attorney and himself, the balance tips heavily in favor of requiring recusal. The cumulative effect of the complaint filed with the Commission, the harsh words [the Judge] had for attorney Anderson in their private conversation, and the Judge's affirmative effort to publicize both the complaint and his opinion of the complaint and of Mr. Anderson, was to create a reasonable basis for questioning [the Judge's] impartiality."

We agree with the Commission's reasoning and its conclusion.

The Judge argues that his denial of the motion to disqualify in *Roper* was challengeable on mandamus or on

appeal, but not sanctionable under the Code. Even if we were to accept the Judge's characterization of his ruling, that does not mean that the Judge's ruling on the motion to disqualify in *Roper* was not cognizable by the process for judicial discipline. That process for judicial discipline is independent of, indeed *must be* independent of, a party's decision in litigation to expend the time and money associated with pursuing a question of judicial conduct that may be examined on review.[7]

■ Under *In re Gustafson, supra,* 305 Or at 660, a judge's conduct is "wilful" within the meaning of Article VII (Amended), section 8, if the judge intends to cause a result or take an action contrary to the applicable rule and if he is aware of circumstances that in fact make the rule applicable, whether or not the judge knows that he violates the rule. We conclude that, for the reasons articulated by the Commission and quoted above, Canon 3C(1) dictates that the Judge should have disqualified himself in the *Roper* case. His denial of the motion to disqualify is sufficient to establish a wilful violation of Canon 3C(1). Although the Judge argues that he acted in good faith, his asserted good faith in coming to the wrong conclusion on the issue of timeliness is not relevant to the determination whether the Judge made an intentional decision that violated the canon; he violated Canon 3C(1) by continuing to sit on the *Roper* case. The good faith nature of that decision, if any, however, is a factor to be considered in assessing the appropriate sanction for a violation.

■ The Judge also argues that because Canon 3C(1) is phrased in terms of "should" rather than "shall," the rule is hortatory rather than mandatory. We do not believe, however, that it can be seriously argued that the term "should" in Canon 3C(1) is merely hortatory when, for example, Canon 3C(1)(a) provides that a judge "should" recuse himself or herself based on actual personal bias or prejudice. As noted, the appearance of impartiality required by Canon 3C(1) is

---

[7] Even when that same judicial conduct is or might be punishable in some other forum on the basis of other laws, nothing in Article VII (Amended), section 8, of the Oregon Constitution, or in ORS 1.420, purports to limit the jurisdiction of this court or the Commission to inquire into wrongful judicial conduct. *In re Fadeley, supra,* 310 Or at 558.

important, and the requirement of recusal is no less stringent in that case.[8]

■ The Judge argues that disciplining him for violating Canon 3C(1) would violate the Fourteenth Amendment because Canon 3C(1) "does not give 'notice' that the particular conduct of [the Judge] in denying the motions to disqualify in the *Hopkins, Roper, Kiemnec*, and *Porter* cases was conduct that would violate the Canon and serve as a basis for discipline."[9] We disagree. Canon 3C(1) requires a judge to recuse himself or herself in any matter in which the judge's impartiality "might reasonably be questioned." That is an objective test of a type that judges routinely are asked to apply. The judge can ascertain whether there is an objective factual basis for a party or lawyer reasonably to question the judge's impartiality. If there is, as there was in the *Roper* case, then ordinarily that will suffice for the judge to be recused.

## C. *The Kiemnec case*

On December 31, 1991, Anderson filed a motion to disqualify the Judge in the case of *Kiemnec and Kiemnec*. The situation in *Kiemnec* was similar to that in *Roper*, except that in *Kiemnec* the Judge did not hold a hearing on the motion. The Judge claims here that there was no point in repeating the substance of the *Roper* hearing in the *Kiemnec* case, although, by referring exclusively to timeliness as a grounds for denial and ignoring the question of disqualification for actual bias and Canon 3C(1), his written order denying the motion seems to belie that claim. The Commission came to the same conclusion in the *Kiemnec* case as in the *Roper* case. For the reasons stated above, we agree with the Commission's reasoning and its conclusion.

---

[8] In context, the term "should" is used in the canon in order to allow for the fact that Canon 3D provides for certain cases in which disqualification will not be required under Canon 3C(1)(c) (financial interest) or Canon 3C(1)(d) (relational interest), based on adequate disclosure by a judge and the written consent of the parties.

[9] The range of constitutional challenges based on "vagueness" is discussed in *Megdal v. Board of Dental Examiners*, 288 Or 293, 296-303, 605 P2d 273 (1980). We will assume, *arguendo*, that the challenge in this case may be cognizable generally as a federal due process claim under the Fourteenth Amendment. *Id.* at 300-03 (recognizing the uncertain state of federal law in this area).

### D. *The Porter case*

On February 21, 1992, the Judge filed a complaint with the Oregon State Bar regarding the conduct of Anderson. The complaint accused Anderson of making false statements to the Commission, of making false statements to the Supreme Court in the *Hopkins* mandamus case, and of making false statements to the circuit court in a motion for change of venue in another case. On the same day, the Judge sent a letter to Anderson and three other lawyers, accusing Anderson of a "vendetta" to discredit and destroy him. The letter also states:

> "[D]ue to the unabated animosity and unabated misrepresentations being made by Mr. Anderson against me as judge through affidavits and letters, it is apparent to me that Mr. Anderson and I cannot work together and may never be able to."

On March 23, 1992, Anderson moved to disqualify the Judge in the case of *Porter and Porter*. The Judge denied that motion as untimely.

The situation in the *Porter* case is similar to that in the *Roper* and *Kiemnec* cases, with the significant additional overlay of the Judge's February 1992 complaint about Anderson to the Oregon State Bar and his letter accusing Anderson of a "vendetta" and stating the Judge's inability to work with Anderson.

The Judge's thinking on the subject of judicial disqualification was reflected in his February 21, 1992, letter to Anderson and several other lawyers, in which he asserted:

> "If the time has passed for filing a motion to disqualify, the attorney who feels that the judge is prejudiced against him must step aside and see that his clients get representation by counsel who can in fact work with the judge before whom the case is pending."

The Judge's apparent conclusion — that essentially he was free to disregard a disqualification motion made in reliance on a claim of *actual* bias or on Canon 3C(1) once the time had run on a *statutory* disqualification motion — is untenable. The gist of his position, *i.e.*, if Anderson reasonably questioned the Judge's impartiality, then Anderson either must accept a judge whose impartiality Anderson thought was questionable

or cease to represent clients in the Judge's court, appears to have been retributive and not simply a good faith legal decision based on the statutory time requirements.

For the same reasons supporting our decision in the *Roper* and *Kiemnec* cases, we conclude, *a fortiori*, that the Judge wilfully violated Canon 3C(1) by denying Anderson's motion to disqualify him in the *Porter* case.

In summary, we conclude that the Judge wilfully violated Canons 1, 2A, and 3C(1) in the *Roper, Kiemnec,* and *Porter* cases.[10] We further conclude that there was no wilful violation of those canons in the *Hopkins* juvenile case.

## CANON 3A(4)

Canon 3A(4) provides in part:

> "A judge should accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. * * *"

The Commission concluded that the Judge had wilfully violated Canons 1, 2, and 3A(4) by initiating *ex parte* communications in two separate matters: (1) in a conversation with District Attorney Goebel, relating to the judge's disqualification in *State v. Vaughan*; and (2) in a letter to a justice of this court after the opinion in *State ex rel Hopkins v. Schenck, supra,* was released. We conclude that the Judge wilfully violated Canons 1, 2, and 3A(4) in the *Vaughan* case, but not in the *Hopkins* mandamus case.

### A. *The Vaughan case.*

The Judge conducted a pretrial release hearing in *State v. Vaughan*, consolidated criminal cases in which the

---

[10] The Judge argues that the blanket disqualifications of judges by attorneys in counties as unpopulated as Wallowa and Union County will have a serious adverse effect on the administration of justice in those counties and that a judge should be able to take that fact into account in making a recusal decision. Although we are aware of the logistical problems associated with changing judicial assignments, especially in rural counties, we cannot countenance a system where the Code is different depending on the size of the county or under which people in less populated counties would be required to accept a different standard of judicial impartiality. The Code applies equally to all Oregon judges.

defendant was represented by counsel and the state was represented by Wallowa County District Attorney Mary Goebel. The Judge set pretrial release conditions with which District Attorney Goebel did not agree.

On June 9, 1992, Goebel filed a motion to disqualify the Judge in the *Vaughan* case. On June 16, the Judge initiated a private conversation with Goebel. On June 17, pursuant to ORS 14.260(1), the Judge challenged the good faith of Goebel's disqualification motion in *Vaughan*. On June 17-18, Goebel made notes of her June 16 conversation with the Judge. The question of a wilful violation of Canon 3A(4) turns on what transpired during the private conversation initiated by the Judge.

In his brief to this court, the Judge states that "[t]his is the only charge regarding which there was some dispute as to the facts and a need for the Commission to judge the relative credibility of the witnesses, namely Ms. Goebel and [the Judge]." The Commission found clear and convincing evidence of a violation, finding that the district attorney's testimony was "more credible":

> "In judging the credibility of these two witnesses, the Commission was influenced by the demeanor of the witnesses and the consistency of Ms. Goebel's testimony with her prior written statement. Much of [the Judge's] testimony in this proceeding, by contrast, was different in tone and substance from what he wrote."

Even on *de novo* review, determinations of credibility are given significant weight when based on the factfinder's perception of a witness's demeanor. *Clauder v. Morser*, 204 Or 378, 391-92, 282 P2d 352 (1955). This basic principle certainly is applicable to a conclusion by a factfinding commission such as this one, which was composed of three trial judges, two lawyers, and two public members in attendance at the hearing. The weight that we accord to the credibility determination based on demeanor also is informed by the fact that the Commission went beyond a mere recital of conclusions about demeanor to state the basis for its conclusions. To the extent, however, that the credibility determination is based on a comparison of the substance of the witnesses' testimony with the substance of other evidence, then this

court on *de novo* review is as well equipped as is the Commission to make that record determination.

Although the Commission's credibility determination in this matter was based in part on the consistency of the district attorney's testimony with her prior written statement, the Commission neglected to note the reason for that consistency, which was elicited at the hearing during the cross-examination of the witness:

> "Q. Okay. Now, your discussion here today, my sense is that you pretty much read from these notes [the notes made by the district attorney on June 17-18 of the June 16 conversation] which are Exhibits 196 and 197?
>
> "A. That's correct.
>
> "Q. And would it be fair to say that that pretty much is your recollection today, as we sit here today?
>
> "A. That's correct.
>
> "Q. However many years ago that was now, or months ago, that you are relying pretty much on those notes?
>
> "A. I am."

The consistency in the district attorney's testimony with her contemporaneous notes of the conversation appears to stem from her reliance on the notes in her testimony, not necessarily from any independently credible present recollection of the events. Thus, although we give substantial weight to the Commission's findings based on demeanor, we are less persuaded by its reliance on the "consistency" in the district attorney's testimony.

In assessing the dispute about what was said during the June 16, 1992, conversation between the Judge and Goebel, we have reviewed and considered the following: the testimony of the Judge and Goebel at the Commission hearing; the pertinent exhibits, including Goebel's relatively contemporaneous notes of the conversation and the contents of the Judge's June 17, 1992, affidavit, which alludes to matters discussed in the conversation the preceding day; the Judge's supplemental affidavit filed in this court concerning that conversation; the parties' briefs; and the Commission's conclusion concerning credibility based on the demeanor of the witnesses.

We find by clear and convincing evidence the following historical and ultimate facts. After a hearing on June 16, 1992, in a case unrelated to *State v. Vaughan*, the Judge asked to speak privately to Goebel. The two of them met in the district attorney's office for about one-half hour. The Judge "initiated" the conversation.

At that time, *Vaughan* apparently was the only case in which the district attorney had moved to disqualify the Judge. The Judge challenged the district attorney's disqualification motion in *Vaughan* the next day. The motion to disqualify in *Vaughan* was a "pending proceeding" within the meaning of Canon 3A(4), and the Judge's challenge to the motion either was a part of that proceeding or, alternatively, was an "impending proceeding" within the meaning of Canon 3A(4).

The Judge's affidavit of June 17, 1992, challenging the district attorney's good faith in moving for his disqualification in *Vaughan*, first addresses his asserted lack of bias in *Vaughan* and then states in paragraph 11:

"I believe the affiant, Mary Goebel[,] has made and filed this Motion to Disqualify without foundation or basis.

"I can only speculate that she has confused, misperceived or mistaken something I have said or done as indication of a personal belief or philosophy that she interprets as being inconsistent with my ability to set [*sic*] as a judge and be fair and impartial in this particular case or cases of this particular type. If so, I believe she has arrived at this conclusion because of inexperience. I have no such personal belief or philosophy, etc. that would affect my ability to be fair and impartial in this case or any like it.

"If there is something in a particular case that causes me concern about my ability to be fair and impartial, I have no reluctance in revealing such and stepping aside.

"I file this challenge for the purpose of airing this issue because of its importance to the administration of justice in Wallowa County and, therefor to the citizens of Wallowa County.

"Ms. Goebel is the elected District Attorney and the sole occupant of that office in Wallowa County.

"I am the elected Circuit Court Judge and the sole occupant of that office in Wallowa County.

"It is crucial that the District Attorney and the Judge be able to work together even if they do not always agree, and they will not. This is a tough profession and a tough business. It is not a place for the faint of heart, the overly sensitive or the immature."

Each of the assertions made in paragraph 11 of the Judge's affidavit relates directly to matters that the Judge raised privately with Goebel on June 16. The Judge's own testimony to the Commission and his brief and affidavit to this court readily acknowledge that those were the same matters that he had raised in his private meeting with Goebel.

The Commission concluded, as do we, that the Judge initiated an *ex parte* communication, the subject and substance of which related directly to the pending or impending motion to disqualify the Judge in *Vaughan* and to his challenge to that motion. The Judge acknowledges that there were circumstances in the *Vaughan* case that made him aware of the applicability of Canon 3A(4); indeed, he contends that he tried to act within the permissible parameters of that canon. Nonetheless, we conclude that the Judge's conduct constituted a wilful violation of Canon 3A(4).

Moreover, we also find clear and convincing evidence in the record that the conversation, which the Judge asserts was focused on the general subject of his disqualification in several cases, included specific references to *Vaughan*, which was the only disqualification motion pending or, apparently, that had been filed by the district attorney. The conversation related not only to the various reasons why the Judge was going to contest the district attorney's good faith motion in *Vaughan*, but also to pretrial release conditions generally and in *Vaughan* specifically. Those facts further establish a wilful violation of Canon 3A(4).

B. *The Hopkins mandamus case.*

After this court issued its decision in *State ex rel Hopkins v. Schenck, supra*, in which the court directed that a peremptory writ issue, the Judge sent a letter to the justice who was the author of the court's opinion. The letter was received at the court on July 24, 1992. Copies of the letter were not sent to the other party or counsel. The letter was signed by the Judge as "R.D. Schenck Circuit Judge."

The letter stated that the Judge's "only gripe" concerning this court's opinion was with what the Judge labeled a "gratuitous" quotation of a statement by Anderson. The letter asserted that Anderson's statement was untrue and that the Judge had never had an opportunity to challenge it in the mandamus case. At the time the Judge's letter was received, the time for a petition for reconsideration of this court's mandamus decision had not yet expired.

The Judge's letter thus was an *ex parte* communication concerning a pending proceeding. It was initiated by the Judge in his capacity as a defendant in a mandamus action. We conclude that sending the letter during the formal pendency of the mandamus case violated Canon 3A(4). In this instance, however, we do not conclude that the Judge committed a "wilful violation" of Canon 3A(4).

There is not clear and convincing evidence that the Judge was aware of circumstances that made the *ex parte* rule apply on these facts, as is required for a "wilful violation" under *In re Gustafson, supra*, 305 Or at 660. Specifically, the record does not establish by clear and convincing evidence that the Judge was aware that the *mandamus* case was still "pending" for purposes of the *ex parte* rule, after this court had issued its decision and had ordered a peremptory writ to issue, but before the period for a petition for reconsideration had expired.

In summary, we conclude that the Judge wilfully violated Canons 1, 2A, and 3A(4) in the *Vaughan* case, but not in the *Hopkins* mandamus case.

### CANONS 1, 2A, AND 3A(6)

Canons 1 and 2A are set forth, *supra*, 318 Or at 405-06.

Canon 3A(6) provides:

> "A judge should abstain from public comment about pending or impending proceedings in any court and should require similar abstention on the part of court personnel subject to the judge's direction and control. This subsection does not prohibit a judge from making public statements in the course of official duties or from explaining for public information the procedures of the court."

The Commission concluded that the Judge wilfully violated Canons 1, 2A, and 3A(6) by writing a letter to the editor of the Wallowa County Chieftain that was published September 17, 1992, and by writing a "guest editorial" for the same news-paper that was published October 1, 1992.[11] For the reasons that follow, we agree with the Commission's conclusions.

## A. *Wilful violation of Canon 2A*

The Judge's letter to the editor states in part:

"The conditions I set in the Vaughan case were tough and reasonable.[12] All Ms. Grote [*sic*] had to say was she demanded even tougher conditions and place the blame on me. Unfortunately her immaturity led her to view herself as the knight on the white charger and to set herself up as all knowing and righteous in her own position. Therefore, I am the devil to be avoided at all costs.

"If Ms. Grote [*sic*] maintains her position [presumably regarding disqualification], the county will not have the services of the Circuit Judge elected by the voters of this county to hear felony criminal cases. Instead, [the presiding judge] or a visiting judge will handle the Circuit Court criminal jurisdiction and the county will be served by a district attorney who has demonstrated a total lack of pre-sent ability, experience and maturity to handle the job of District Attorney. I will expand on the latter with specifics in another report."

The "report" that followed two weeks later in the Judge's guest editorial was, as promised, an extended essay on Goebel's asserted lack of competence, experience, profes-sional demeanor, and personal maturity, citing specific instances in identifiable cases in the Judge's court, as well as

---

[11] *See* Appendix.

The brief of *amicus curiae* ACLU Foundation of Oregon, Inc., is limited to addressing the Commission's recommendation that the Judge be disciplined for publicly criticizing the Wallowa County District Attorney. The *amicus curiae* assumes, *arguendo*, that such conduct violates the Code but, nonetheless, concludes that Article I, section 8, of the Oregon Constitution, and the First Amendment to the Constitution of the United States protect the Judge from discipline for publicly criticizing the district attorney. *Amicus* does not address the Commission's recom-mendation that the Judge be disciplined for other misconduct.

[12] As noted, the *Vaughan* cases were pending at the time the Judge wrote his letter to the editor.

general matters relating to her professional demeanor. The editorial concluded:

"Ms. Goebel is a lovely young lady. But she has placed herself in a position for which she has neither the training or [sic] experience to perform the duties competently.

"Unfortunately, in this instance, it is the public that will get the short end of the stick."

After discussing historical problems in attracting a qualified or motivated district attorney in the county, the editorial ultimately concluded:

"Perhaps the county court [the local governing authority] needs to investigate what alternatives might be available to ensure the county has a vigorous, competent prosecutor."

Those statements by the Judge, regardless of the Judge's belief in their truth or whether they are in fact true, do not preserve or promote public confidence in the integrity and impartiality of the judiciary. After those public broadsides, which the Commission found to exhibit "a maliciousness towards Goebel which was remarkable in its intensity and in the public way in which [the Judge] chose to display it," the public reasonably might have questioned the Judge's impartiality in any matter involving Goebel. The statements, therefore, are inconsistent with Canons 1 and 2A.

The Judge's statement in the editorial that a "judge must maintain impartiality, especially in criminal trials and cannot help either side present their case," does not invalidate our conclusion in that regard.[13] Although that statement is true, and although it may reflect the Judge's concern for promoting the public's confidence in the Judge's impartiality, the weight of the Judge's unsolicited public criticism

---

[13] The editorial expressly discussed the issue of the Judge's alleged bias against the state:

"[Ms. Goebel] accuses me of being biased against the State. The problem is really the opposite for me as judge. The real problem I face with Ms. Goebel is how do I insure that the State gets a fair trial? How do I insure that the people of Wallowa County have their case against the criminal defendant properly and competently presented — when it is obvious that the people's prosecutor often does not have a clue as to how to proceed?

"The judge's hands are tied for the most part. The judge must maintain impartiality, especially in criminal trials and cannot help either side present their case."

of Goebel's alleged lack of competence, experience, professional demeanor, and personal maturity overwhelms the quoted statement.

We conclude that there is clear and convincing evidence in this record that the Judge was aware of circumstances making Canon 1 and 2A applicable in these circumstances and that his attack on the district attorney was a wilful violation of Canons 1 and 2A.

### B. *Wilful violation of Canon 3A(6)*

Canon 3A(6) generally prohibits judicial public comment about pending or impending proceedings in any court, except public statements in the course of official duties to explain for public information the procedures of the court. There is little doubt that the letter and editorial are public comment by the Judge on matters pending or impending in the Wallowa County Circuit Court. After a general discussion of the subject of pretrial release conditions, the letter contains specific reference to the pretrial release conditions in *State v. Vaughan*, pending cases. The editorial refers at length to the Judge's opinion that Goebel lacked competence to represent the state in Wallowa County criminal prosecutions (*viz.* pending and impending cases in the circuit court), wherein Goebel is the only criminal prosecutor. There also is little doubt that the circumstances were such that the Judge was aware of facts that would make Canon 3A(6) applicable.

Many of the Judge's statements do not meet the exception in Canon 3A(6) for "public statements in the course of official duties" or for "explaining for public information the procedures of the court." The statements were not made in the course of the Judge's official duties. Although the Judge's guest editorial calls itself a "report on my observations and evaluation of the performance of Mary Goebel as District Attorney for Wallowa County," a circuit court judge has no duty to make such a report, much less one to a newspaper. Although there is some information in both the letter to the editor and the guest editorial that might qualify as public information about court procedures, there is much in each communication that does not.

For example, the statement that a "judge must maintain impartiality, especially in criminal trials and cannot

help either side present their case," may qualify as public information about court procedure. By contrast, statements such as "[s]he does not have a grasp of how to present a witness," "[s]he does not understand the purpose of expert testimony in sex abuse cases," "she has placed herself in a position for which she has neither the training or [sic] experience to perform the duties competently," and "[t]he real problem I face with Ms. Goebel representing the State is how do I insure [sic] that the State gets a fair trial?" do not qualify as explaining court procedure for public information.[14] The presence of some permissible information does not sanitize the other material in each communique that is a public comment about pending or impending circuit court cases.

We conclude, accordingly, that there is clear and convincing evidence in this record that the Judge wilfully violated Canon 3A(6). The text and context of that provision do not, expressly or by necessary implication, carry with them the requirement that the statement be made with the intent to affect the outcome or to impair the fairness of a particular case. Rather, the provision clearly delineates permissible from impermissible judicial declarations concerning pending or impending cases, with the scope of the prohibition subject, of course, to constitutional limitations on the regulation of speech. *See generally In re Fadeley, supra*, 310 Or at 559-71 (concerning constitutional limits on the regulation of judicial speech); Gross, *Judicial Speech: Discipline and the First Amendment*, 36 Syracuse L Rev 1181, 1230-36 (1986) (discussing the relationship between Canon 3A(6) and the First Amendment, noting that, as of 1986, no case had specifically raised the issue); McMahon, Annot., *First Amendment Protection For Judges Or Government Attorneys Subjected To Discharge, Transfer, Or Discipline, Because Of Speech*, 108 ALR Fed 117, §§ 3-9 (1992).

C. *Canon 4A does not excuse the violations of Canons 1, 2A, and 3A(6)*

Canon 4 provides in part:

---

[14] The Commission concluded that the Judge's statements created the impression that the Judge would have to perform the prosecutor's role and would be biased in favor of the State in order to make up for the alleged incompetence of the district attorney. That conclusion appears to be warranted.

"A judge, subject to the proper performance of judicial duties, may engage in the following quasi-judicial activities, if in doing so the judge does not cast doubt on his or her capacity to decide impartially any issue that may come before the judge:

"A. A judge may speak, write, lecture, teach and participate in other activities concerning the law, the legal system and the administration of justice."

As we have already held, the Judge's writings in this case, even if we were to assume *arguendo* that they pertain only to "the law, the legal system and the administration of justice," do, in fact, cast doubt on the Judge's "capacity to decide impartially any issue that may come before the judge" in matters involving Goebel. Canon 4A does not authorize what Canons 1, 2A, and 3A(6) prohibit in this case.

D. *Application of Canons 1, 2A, and 3A(6) does not violate the Judge's constitutional free speech rights.*

1. *The Oregon Constitution.*

Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

It would be possible to dismiss the Judge's arguments under Article I, section 8, of the Oregon Constitution by resort to *stare decisis*. We have held that the right of a person subject to the Code, under Article I, section 8, to "speak * * * freely on any subject whatever" was "modified" by the subsequent adoption of Article VII (Amended), section 8, relating to judicial discipline.

"We have no difficulty in holding that, in this context, it is Article I, section 8, that is modified. * * * We hold that Canon 7B(7) does not offend Oregon Constitution, Article I, section 8, because rules such as Canon 7B(7) were contemplated as a consequence of the adoption by the people of Oregon Constitution, Article VII (Amended), section 8." *In re Fadeley, supra,* 310 Or at 560.

Canons 1, 2A, and 3A(6) of the Code were in existence before Article VII (Amended), section 8, was adopted.

Thus, as we did in *In re Fadeley, supra*, when considering Canon 7B(7) (concerning fundraising by a judicial candidate for election), we could hold that discipline for a violation of Canons 1, 2A, and 3A(6) does not violate Article I, section 8, of the Oregon Constitution. We choose, however, not to ground our decision in this case on the Article VII (Amended), section 8, rationale of *In re Fadeley*, because two of the three permanent members of this court who are participating in the present panel dissented from that portion of the rationale. *See In re Fadeley, supra*, 310 Or at 591-98 (Unis, J., dissenting in an opinion in which Van Hoomissen, J., joined). However, there is a separate, traditional line of analysis under Article I, section 8, of the Oregon Constitution, that yields the same result under the facts of the present case.

Notwithstanding its unequivocal holding, *In re Fadeley* went on to state in *dictum* that:

> "Even if the adoption by the people of subsection (e) to Article VII (Amended), section 8, of the Oregon Constitution were *not* a qualification on the rights guaranteed by Article I, section 8, of the Constitution [the court having just held that it *was* a qualification of those rights], traditional analysis under Article I, section 8, would yield the same result in this case. The right to speak, write, or print freely on any subject whatever, is not absolute. It may be curtailed, for example, in the regulation of certain professions. The case of *In re Lasswell, supra*, is illustrative." *Id.* at 561 (emphasis added).

This court then proceeded to discuss the "traditional analysis" by reference to *In re Lasswell*, 296 Or 121, 673 P2d 855 (1983) (lawyer disciplinary case involving public comments by the district attorney on facts relating to an investigation that led to 50 arrests and indictments). *In re Fadeley, supra*, 310 Or at 561-64. The principal point examined by the court in that context was whether the speech in question was such as to pose "a serious and imminent threat to the process" and was, therefore, "incompatible" with the public servant's "official function," such that the restriction on speech was valid. *In re Fadeley, supra*, 310 Or at 563; *In re Lasswell, supra*, 296 Or at 124-27.

In making that determination, the court in *Fadeley* "balanced" the competing interests (the regulatory interest and the individual's interest) along with a consideration of

the precise nature of the restriction on speech. *In re Fadeley, supra*, 310 Or at 563. The court concluded that the Code's restriction on personal fundraising by a judicial candidate was justified by the "profound" stake that the public has in the fact and appearance of integrity and impartiality of the judiciary and the limited impairment of the judicial candidate's fundraising and speech imposed by the rule. *Id.* at 563, 565, 571.

For essentially those same reasons, discussed more fully below in the context of our discussion of the Judge's First Amendment challenge, we conclude that even an application of "traditional" Article I, section 8, principles to this case would yield the same result that the court reached in that case. That is, we hold that the Judge's actions in causing the publication of the letter and the editorial posed a serious and imminent threat to the public's confidence in the integrity and impartiality of the judiciary in general and of the Judge himself in particular. Thus, the Judge wilfully violated Canons 1 and 2A. Similarly, we hold that the Judge's actions were a direct comment on the quality of prosecution to be expected in pending and impending criminal matters that were to come before him in Wallowa County. Such wilful violations of Canon 3A(6) similarly created a serious and imminent threat to the public's confidence in the integrity and impartiality of the judiciary — the value that the Canons manifestly are intended to protect. Under *In re Lasswell, supra*, imposition of a sanction on an elected public official in such circumstances does not violate that person's rights under Article I, section 8, of the Oregon Constitution. We now hold in this case that the imposition of discipline under Canons 1, 2A, and 3A(6) does not violate Article I, section 8, of the Oregon Constitution.

## 2. *The United States Constitution*

The First Amendment to the Constitution of the United States provides in part:

"Congress shall make no law * * * abridging the freedom of speech * * *."[15]

---

[15] The First Amendment applies to the states by application of the due process clause of the Fourteenth Amendment. *New York Times Co. v. Sullivan*, 376 US 254, 265 n 4, 84 S Ct 710, 11 L Ed 2d 686 (1964).

The Judge argues that, even if the restrictions on speech embodied in Canons 1, 2A, and 3A(6) do not offend the Oregon Constitution, they do impermissibly interfere with political speech protected by the First Amendment to the Constitution of the United States. This case does not fit neatly into the existing analytical framework for First Amendment analysis. The speech here is addressed to a matter of legitimate public concern, a form of political expression, "at the heart of the values expressed in the First Amendment," entitled thereby to exacting constitutional scrutiny when it is regulated. *In re Fadeley, supra*, 310 Or at 565 (citing *Buckley v. Valeo*, 424 US 1, 25, 96 S Ct 612, 46 L Ed 2d 659 (1976)). However, the case also has similarities to the line of cases dealing with speech by public employees. *See Shockey v. City of Portland*, 313 Or 414, 424-31, 837 P2d 505 (1992) (analyzing traditional public employee speech under the First Amendment); *Scott v. Flowers*, 910 F2d 201, 211-12 (5th Cir 1990) (considering the discipline imposed on an elected justice of the peace under the usual analysis applied to public employee speech, while also recognizing that the justice of the peace "was not, in the traditional sense of that term, a public *employee*"). (Emphasis in original.) Although we would reach the same result applying the analysis from *Buckley v. Valeo, supra*, we will apply the traditional public employee free-speech analysis in this case. *Compare In re Fadeley, supra*, 310 Or at 565 (discussing and applying *Buckley v. Valeo* in judicial discipline context).

In *Pickering v. Board of Education*, 391 US 563, 568, 88 S Ct 1731, 20 L Ed 2d 811 (1968), the Supreme Court stated that, while a public employee is not compelled to relinquish First Amendment rights to comment on matters of public interest, those rights must be weighed against the interest of the state as an employer in regulating the speech of its employees, to promote the efficiency of the public services the state performs through its employees. In *Connick v. Myers*, 461 US 138, 103 S Ct 1684, 75 L Ed 2d 708 (1983), the Court followed the *Pickering* framework, stating that the balancing required "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public," *id.* at 150, how much of the employee speech substantially involved matters of public concern, *id.* at 154, and the manner, time, place and context of the speech.

*Id.* at 152-53. In *Rankin v. McPherson,* 483 US 378, 388, 107 S Ct 2891, 97 L Ed 2d 315 (1987), the Court again applied *Pickering,* stating:

> "[T]he state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest."

The Court also added that "[t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Id.* at 390.

 In this case, we conclude that the governmental interest that we have already recognized from the Code, *viz.,* an interest in protecting both the fact and the appearance of the impartiality and integrity of its judiciary, is profound. *See In re Fadeley, supra,* 310 Or at 563, 571 (so characterizing that governmental interest). The prohibition on comments on pending or impending cases, and the prohibition on comments that undermine the public's confidence in the judge's impartiality, are directly related to the furtherance of that interest. The former prohibition is closely drawn to achieve those interests; the latter is more general in its reach. Neither is impermissibly overbroad on its face.

The degree of interference with the judge's right to speak that we hold to be permissible here, particularly in the context of pending or impending cases, is appropriate to the circumstance. It is a limited restriction on the Judge's right to speak freely and publicly. The application of that limitation in this case — *viz.,* to restrict a judge's right to "report" to the public on the specific and general competence and professional/personal maturity and demeanor of the district attorney, which report reasonably calls into question at least the Judge's impartiality towards the district attorney and, derivatively, the public interest that she represents — does not offend the First Amendment. The limitation on speech in this case is directly related to, and is narrowly drawn so as to further, the governmental interest in maintaining the fact and the appearance of an impartial judiciary, and is justified by the profound nature of that interest. On these facts, we

conclude that the First Amendment does not insulate the Judge's violations of Canons 1, 2A, and 3A(6) from discipline.

For a contrary conclusion, the Judge relies on *Scott v. Flowers, supra,* in which the United States Court of Appeals for the Fifth Circuit voided the discipline imposed on a justice of the peace for criticizing a higher county court in an interview and in an "open letter" published in the local newspaper. *Scott* is the only case cited by the parties where issues similar to this case were addressed.

Scott was an elected justice of the peace in Fort Bend County, Texas, where justice courts are not courts of record and, on appeal, defendants are entitled to trials *de novo* in the county court. Apparently, the great majority of the defendants who appealed their traffic offense convictions from justice or municipal courts in the county to the county court during Scott's term in office succeeded in having the charges against them dismissed or their fines sharply reduced. *Scott v. Flowers, supra,* 910 F2d at 203-04.

> "This practice, Scott believed, unfairly allowed those 'in the know' to violate the traffic laws repeatedly and with impunity while penalizing less sophisticated individuals who committed the same offenses.
>
> "In September 1983, Scott took his concerns to the local government and the citizenry by writing an 'open letter' to county officials. In the letter, Scott attacked the district attorney's office and the county court-at-law for dismissing so many traffic ticket appeals and called upon the county officials to offer suggestions to remedy the problem. If the county refused to change this practice, Scott concluded, the public at least should be made aware of it, and the court-at-law 'would be really busy then.' " *Id.* at 204.

In connection with his open letter, Scott also stated to a reporter that "the county court system is not interested in justice." *Id.* at 205. After Scott was reprimanded by the Texas Commission on Judicial Conduct, he filed an action under 42 USC § 1983 in federal district court to void that sanction. The district court granted summary judgment in favor of the Texas Commission, concluding that Scott would have been reprimanded even if he had not written the open letter and therefore that he was entitled to no relief. The district court thus found it unnecessary to reach the issue of whether

Scott's conduct in writing the letter was in fact a constitutionally-protected activity. *Id.* at 206. The Fifth Circuit reversed.

The Fifth Circuit's opinion in *Scott* does not point to Texas judicial canons that parallel Canons 1, 2A, and 3A(6) of the Oregon Code of Judicial Conduct, although the Fifth Circuit and the Texas Commission on Judicial Conduct recognize the state's interest in promoting an efficient and impartial judiciary and public confidence therein. *Id.* at 204 n 3, 205 n 6, 212-13. The decision uses a "public employee" speech analysis, *id.* at 210-13, *see also Shockey v. City of Portland, supra,* 313 Or at 424-31 (setting forth that analysis) and concludes that the speech at issue in *Scott* touches on core First Amendment values:

> "Accordingly, the Commission must carry a very difficult burden in order to demonstrate that its concededly legitimate interest in protecting the efficiency and impartiality of the state judicial system outweighs Scott's first amendment rights.
>
> "We conclude that the Commission has failed to carry that burden. Neither in its brief nor at oral argument was the Commission able to explain precisely how Scott's public criticisms would impede the goals of promoting an efficient and impartial judiciary, and we are unpersuaded that they would have such a detrimental effect. Instead, we believe that those interests are ill served by casting a cloak of secrecy around the operations of the courts, and that by bringing to light an alleged unfairness in the judicial system, Scott in fact furthered the very goals that the Commission wishes to promote." *Scott v. Flowers, supra,* 910 F2d at 212-13 (footnote omitted).

Although we might agree with the Fifth Circuit's conclusion if confronted with facts identical to those in the *Scott* case, the facts in the case before us are not the same as those in *Scott*.

The similarity between this case and *Scott v. Flowers* is limited to our conclusion that the judge's comments in each case concerned a "matter of legitimate public concern,"[16]

---

[16] *See Pickering v. Board of Education,* 391 US 563, 571, 88 S Ct 1731, 20 L Ed 2d 811 (1968) (first, the court must determine in light of the content, form, and context of the speech in question whether it addresses a matter of legitimate public concern).

thereby implicating core First Amendment values. On the other hand, whereas Scott's open letter addressed practices that occurred on appeal in a higher court, the Judge's comments in this case were addressed to practices by a lawyer who appeared in his court.[17] Scott's comments were primarily addressed to "bringing to light an alleged unfairness in the judicial system," comments that arguably pertain to the administration of justice on appeal and that might be permissible in Oregon under Canon 4A. In contrast, the Judge's comments here were focused primarily on criticizing the competence and personal/professional maturity and demeanor of the district attorney, thus casting into question not only the appearance, but also the fact, of the Judge's ability to be impartial in any pending or impending case in his court involving the district attorney.

Also, unlike *Scott v. Flowers*, in which the Texas Commission could not specifically articulate how Scott's remarks would impede the legitimate state interests of maintaining the appearance of an impartial judiciary and public confidence therein,[18] we already have stated in this case that Canons 1, 2A, and 3A(6) are drawn specifically to further those profound interests, and we already have concluded here that the Judge's wilful violation of those canons, including comments on pending or impending cases in his court, could cause members of the public reasonably to question his impartiality. There is nothing in the Fifth Circuit's decision in *Scott v. Flowers* that persuades us to reach a different conclusion under the analysis that we have followed here. For the reasons discussed, we conclude that the manner, time and place in which the Judge raised these issues makes his discipline constitutional. We hold that the First Amendment does not insulate the Judge's speech here from sanction. *See Rankin v. McPherson, supra*, 483 US at 388-90 (free speech

---

[17] In *Scott v. Flowers*, 910 F2d 201, 213 n 24 (5th Cir 1990), the Fifth Circuit emphasized that its

"holding is limited to the narrow question before us, which is whether a judge can be reprimanded for publicly commenting upon the administration of justice as it relates to cases that pass through his court."

[18] At most, the Texas Commission found that Scott's comments were destructive of public confidence in the judiciary, pursuant to the Commission's underlying authority to discipline a judge for conduct that "casts public discredit on the judiciary or on the administration of justice." *Scott v. Flowers, supra*, 910 F2d at 204 n 3.

rights balanced against interference with work, speaker's job performance, public accountability of speaker); *Connick v. Myers, supra,* 461 US at 150-52 (same); *Pickering v. Board of Education, supra,* 391 US at 568 (same).

## DUE PROCESS AND OTHER CLAIMS

The Judge contends that the Commission combines investigatory, prosecutorial, and adjudicative roles, in violation of his right to procedural due process of law under the Fourteenth Amendment to the Constitution of the United States.[19] That contention is not well taken. The Commission follows a fairly standard administrative law model of contested case adjudication, and the Supreme Court of the United States has held that, without more, this administrative adjudication paradigm does not violate due process. *Withrow v. Larkin,* 421 US 35, 46-47, 52, 95 S Ct 1456, 43 L Ed 2d 712 (1975) (citing 2 K. Davis, Administrative Law Treatise 175, §13.02 (1958)). Moreover, the Commission has no independent authority to discipline a judge; its recommendations are reviewed *de novo* by this court, which is the final adjudicative authority. Or Const, Art VII (Amended), § 8(1)(e); ORS 1.425(6). We hold that the operation of the Commission did not deprive the Judge of federal procedural due process.

The Judge also argues that the Commission failed to provide him with adequate notice and an opportunity to defend, in violation of his Fourteenth Amendment right to procedural due process of law and Commission rule, and that the Commission denied him his right to equal privileges and immunities under Article I, section 20, of the Oregon Constitution.[20] We have considered those arguments and find them unpersuasive.

## SANCTION

In disciplining judges, this court has available several different sanctions from which to choose. The court may

---

[19] The Fourteenth Amendment to the Constitution of the United States provides in part:

"No State shall * * * deprive any person of life, liberty, or property, without due process of law[.]"

[20] Article I, section 20, of the Oregon Constitution, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

censure the judge, or it may suspend the judge (with or without pay) or remove the judge from office. Or Const, Art VII (Amended), § 8(1)(e); ORS 1.430(1).[21] In deciding which of those sanctions to impose in a particular case, it is necessary to consider the purposes of disciplining judges. Judges are disciplined primarily to preserve public confidence in the integrity and impartiality of the judiciary. Thus, disciplining judges serves to educate and inform the judiciary and the public that certain types of conduct are improper and will not be tolerated. Discipline of a judge also serves to deter the disciplined judge as well as other judges from repeating the type of conduct sanctioned. *See* Gross, *supra*, 36 Syracuse L Rev at 1256-61 (discussing discipline to be imposed).

■ The Commission's recommendation states:

"* * * [the Judge's] conduct repeatedly fell short of the governing standards of judicial conduct. In determining an appropriate sanction in judicial discipline cases, the Commission evaluates several criteria, including: the impact upon litigants and attorneys of the judge's conduct; the extent to which the conduct tends to undermine public confidence in the judicial system; the seriousness of the violations; and the extent to which the judge demonstrates an interest in avoiding similar problems in the future."

We agree with the Commission's statement of the general criteria to be evaluated in determining the appropriate sanction in judicial discipline cases. After considering those criteria in the light of testimony and evidence it received, the Commission recommended that the Judge be suspended from office without pay for a period of three months.

We have found wilful violations of Canons 1, 2A, and 3C(1) in the *Roper, Kiemnec,* and *Porter* cases, wilful violations of Canons 1, 2A, and 3A(4) in the *Vaughan* case, and

---

[21] *See, e.g., In re Fadeley, supra,* 310 Or at 573 (censure); *In re Jordan,* 290 Or 303, 622 P2d 297 (1981) (removal from office); *In the Matter of Sawyer,* 286 Or 369, 384, 594 P2d 805 (1979) (no discipline imposed; prohibition on future dual service as teacher and judge); *In the Matter of Field,* 281 Or 623, 637, 576 P2d 348, *reh'g den* 281 Or 638 (1978) (removal from office). The court also has suspended a judge from the practice of law for misconduct as a judge, *In re Edwin L. Jenkins,* 244 Or 554, 560, 419 P2d 619 (1966) (decided before the adoption of Article VII (Amended), section 8(1)(e)), and has held that suspension or disbarment of a judge from the practice of law does not necessarily result in removal from the bench during the judge's term of office, *In re Piper,* 271 Or 726, 741, 534 P2d 159 (1975).

wilful violations of Canons 1, 2A, and 3A(6) with respect to the Judge's public statements about the district attorney. We proceed to consider the appropriate sanction for those violations by first evaluating them in the context of the criteria stated above.[22]

### A. *Violations of Canon 3C(1).*

Even if there is no actual, demonstrable impact from a judge's refusal to recuse himself or herself in violation of Canon 3C(1), there is presumptively a significant impact on the trust of the public and the litigants in an impartial judiciary when a judge sits on a case in which the judge's impartiality reasonably may be questioned.

Here, the Judge's good faith in weighing the issue of his disqualification was evident in the *Roper* case and will be presumed in the *Kiemnec* case, each of which was a case where recusal was required, but neither of which was a case where that conclusion was beyond dispute. In the *Porter* case, however, the record does not establish that the Judge gave the issue of his disqualification under Canon 3C(1) adequate, if any, consideration, although his recusal clearly was required after the judge had complained so vehemently to the Bar about Anderson and sent his letter stating that he no longer could work with Anderson.[23] The violations of Canon 3C(1) in the *Roper* and *Kiemnec* cases were relatively minor; the violation in the *Porter* case, however, was serious.

Before the Commission, the Judge vigorously defended his position, and the Commission stated in its findings:

> "During the course of [the Judge's] testimony, it became clear that the Judge believes that, in every instance cited in the Commission Complaint, his conduct was consistent with [the Code's] high standards. There was, therefore, no acknowledgement on his part that he would learn anything from the proceeding or be more attentive to his obligations

---

[22] The violations of Canons 1 and 2A are not discussed separately in this section.

[23] We do not suggest that in every instance in which a judge calls a matter about an attorney to the attention of the Oregon State Bar that the judge must, *ipso facto*, recuse himself or herself from any matter involving that attorney. The question is matter specific.

under the Code in the future. To use a slightly overworked phrase of the day, in the Commission's opinion, [the Judge] 'just does not get it.' "

In his brief to this court, the Judge responded:

"As to the disqualification and speech issues, it is [the Judge's] opinion that the Commission never got it and probably still hasn't. The Commission demonstrated a serious lack of understanding of the law in these areas, and [the Judge] has paid dearly for that."

Certainly any person, judge or not, accused of violating a code of professional conduct has the right to defend himself or herself vigorously. A vigorous defense does not *necessarily imply* that the accused judge is insensitive to a problem or to suggest that, if a violation is found by this court, the judge will not seek to correct that problem. Nevertheless, at least with respect to the Judge's conduct in the *Porter* case (and his unsuccessful attempt to defend his conduct in that case before the Commission and before this court on the grounds of sound judicial administration), we confess a genuine concern about the Judge's resolve either to understand the true nature of such problems or to avoid them in the future.

### B. *Violation of Canon 3A(4).*

The Judge's *ex parte* contact with District Attorney Goebel in the *Vaughan* cases apparently had no impact on the parties, the attorneys, or the merits of the cases. Moreover, on this record, we cannot say that by itself the contact had a significant impact on the public's confidence in the judiciary. Nonetheless, the violation of Canon 3A(4) was clear, and the Judge has asserted in this court that now he does "get it" with respect to such contacts, and that he will avoid them in the future. We accept that assertion, particularly because it exists in marked contrast to the Judge's attitude with respect to his other violations.

### C. *Violation of Canon 3A(6).*

The Judge's public comments about pending or impending proceedings in his court and about the district attorney were improper. By calling into question the appearance, if not the fact, of the Judge's ability to be impartial to the district attorney, the comments tend to undermine public

confidence in the judicial system. Because of the calculated, unsolicited, and personal nature of the comments, we consider the violation of Canon 3A(6) in this instance to be serious. Based on the totality of the record, we are not fully persuaded that the Judge will seek to avoid such comments in the future.

### D. *Sanction*

Having laid out in detail the violations of the Code and how they relate to the sanction determination, we turn to consider the proper sanction. The Judge contends that no sanction is appropriate. The Commission recommended a suspension of three months without pay.[24]

Neither party has cited authorities bearing on the question of the appropriate sanction. The ABA Model Code of Judicial Conduct (1990) contains no pertinent provisions, and the case law from other jurisdictions varies widely and is of little value in this respect. *See generally Judicial Discipline and Disability Digest: 1960-1978*, Part 5: Judgment (Rosenbaum, ed., 1981, Supp 1991). We shall consider the question of an adequate sanction in the context of the factors that we have already addressed and with reference to our own prior judicial discipline decisions, without suggesting by doing so that the decisions discussed below provide an exclusive list of appropriate circumstances for the imposition of a particular sanction.

Removal from office is appropriate where the judge is not competent to perform the duties of the office, *In the Matter of Field, supra*, 281 Or at 634-37, or where a series of misconduct incidents calls into question the judge's competence and integrity, *In re Jordan*, 290 Or 303, 336-37, 622 P2d 297, *reh'g den* 290 Or 669 (1981). This court has also stated in *dictum* that:

> "Whether removal is the appropriate solution depends not only on the magnitude of the violation but also on the

---

[24] This court, not the Commission, is charged with the constitutional duty and authority to determine and impose a sanction in this judicial discipline case. Accordingly, the Commission's recommendation for sanction does not receive any deferential consideration in this court, however, to the extent that it is well-reasoned, it can be a useful referent for the court. *See In re Fadeley, supra*, 310 Or at 571-73 (quoting at length from and ultimately agreeing with the Commission's censure recommendation).

probability of the violation's recurrence. If the violation is likely to recur, removal is appropriate." *In the Matter of Field, supra,* 281 Or at 635.

We would clarify the last statement by explaining that, if the violation is likely to recur, removal *may be* appropriate, depending on the totality of the circumstances.

██ Although we do have some concerns about the Judge's future conduct, his past conduct does not affirmatively establish that he is not competent to be a judge. Nor has his integrity been directly called into question in this case. We conclude that his removal from office is not an appropriate sanction in this case.

 On the other hand, neither is censure an appropriate sanction. Censure may be appropriate in a particular case for extra-judicial conduct that violates the Code, but which is not directly related to the judge's performance in office. *In re Roth,* 293 Or 179, 189, 645 P2d 1064 (1982) (censure for conduct that amounted to criminal mischief in the third degree and a wilful violation of Canon 2A). It also may be an appropriate sanction, even for a significant violation of the Code as it relates to judicial conduct *per se,* where the conduct was public and where the court has "no reason to think that the incidents will be repeated or that the Accused requires any greater sanction than the publication of this opinion and the publicity attendant to this proceeding." *In re Fadeley, supra,* 310 Or at 573 (censure of a sitting judge for violations of the Code's prohibition on fundraising conducted while a candidate for the office).

The case that comes closest factually to the case now before us is *In re Gustafson, supra.* In that case, a new district court judge was charged with various complaints relating to his handling of criminal cases. The Commission found violations in 13 cases. *In re Gustafson, supra,* 305 Or at 657. On review, the judge acknowledged that his behavior in each instance was improper, but contested whether it was "wilful." *Id.* at 663. This court found the following wilful violations of the Code: (1) in three cases, the judge interfered with the female public defender's relationship with her clients in situations where the judge's negative personal feelings about the lawyer entered into his rulings in the cases; (2) in two cases, including one involving the same public

defender, the judge acted in court in a manner that was impatient, discourteous, and rude to counsel; and (3) in one case, contrary to law, the judge changed a sentence imposed by a visiting judge, without determining whether he had the authority to do so. *Id.* at 664-69. With respect to the proper sanction, the court held:

> "In sum, we find that Judge Gustafson's conduct repeatedly fell short of the governing standards of judicial conduct and that it was 'wilful' within the meaning of Article VII, (Amended), section 8(1)(b) and (e) in those instances identified above.
>
> "As to the sanction, the judge's brief in this court paints the picture of 'an inexperienced judge in a new court who had not yet learned to exercise authority expertly' and argues that 'ability to deal dispassionately with disagreeable conduct and events' is something that must be learned. We acknowledge the point * * *. Although Judge Gustafson was slow to recognize that his conduct in office fell short of judicial standards, it appears that he has undertaken steps to learn from his unfortunate start. We see no need for, or useful purpose to be served by, a suspension.
>
> "Accordingly, the foregoing opinion will serve as a judgment of censure of Judge Gustafson's conduct." *Id.* at 669-70.

In contrast, in this case, the Judge's positions have borne few signs that he views the future in a manner materially different from the past. There are important lessons to be learned from this case, and we are convinced that a suspension of the Judge without pay is the only way to ensure that he will learn those lessons. We also are convinced that a suspension is necessary to maintain public confidence in the integrity and impartiality of the judiciary that demands adherence to the standards of conduct it has set for itself and for the fair administration of justice.

The accused is suspended from office without pay for a period of 45 days, commencing on the effective date of this decision.

## APPENDIX

### Wallowa County Chieftain
### Letter to the Editor
### September 17, 1992

"I was more than a little disturbed by the article entitled 'Schenck disqualified from abuse case.'

"The reporting of the disqualification was fine. The disturbing part was linking the reason for the disqualification with the Lewis case in Union County and completely misrepresenting the facts of the Lewis case and my actions in it.

"This linking and misrepresentation gave the impression that I am in some way sympathetic to child molesters. Anyone who knows me even slightly, knows that is a completely and totally false impression.

"For the past decade there has been more than a little hysteria connected with the handling by law enforcement and the courts of allegations of child sexual abuse.

"I will not run a court that is driven by hysteria or political pressure of any kind in any type of case.

"The use and abuse of a child in any manner for adult sexual gratification is abominable. Child sexual abuse or even just physical abuse almost universally raises in normal people strong passions and demands for severe consequence to the perpetrator.

"In most of the cases, the perpetrator admits or there is strong evidence and guilt is fairly easily established.

"However, there are those cases where allegations are made and for varying reasons, nothing is very clear.

"Sometimes it is a proof problem where there are no eyewitnesses except the child victim and the perpetrator, and very little or no physical evidence — or the physical evidence is not clearly tied to the abuse — could be caused by some other trauma, physical or mental, etc.

"Sometimes the motive of the person reporting is challenged, such as in child custody cases where one parent accuses the other, or where teenagers have a history of discipline problems with the parent and the child is accusing the parent.

"There are also problems of time passing between the alleged abuse and the reporting, especially where very young

children are the victims. Quite often they do not report until later in life. This raises memory and perception problems.

"The methods and procedures used by those investigating the allegations are critical in cases where the child victim's testimony is critical — especially a very young child.

"The investigative interview must be conducted without any hint of leading or suggestive questions or information being fed the child. Law enforcement and child protective personnel have, over the last decade, made significant strides in this area but more is being learned every day.

"Children, like adults, sometimes misperceive and some are suggestible.

"Once an allegation of child sex abuse is made, the consequences are devastating and irretrievable. Adults are destroyed; children are destroyed; whole families are destroyed.

"Where there are significant problems with a child sex abuse case, it becomes a prosecutor's worst nightmare. If they prosecute and lose, they have not only not brought a perpetrator to justice and thereby accomplish some measure of protection of the victim and the public, but they have further traumatized the victim and the victim's family and possibly destroyed the life of the alleged perpetrator.

"If they do not prosecute, they stand to be vilified by the persons bringing the charge and by the media.

"Courts do not have as difficult a job as prosecutors in those cases, but there is almost unanimous agreement amongst judges across the nation that contested child sex abuse cases are the most difficult cases which courts are called upon to handle — especially the pre-trial proceedings and sentencing. Usually a jury takes the burden of deciding guilty or not guilty.

"The court is faced with the first difficult decision when release pending trial is an issue.

"The law is clear that a defendant has the right to release pending trial (except in cases of murder where there is clear and convincing reason to believe the defendant is guilty) upon posting reasonable bail or on the defendant's own recognizance if there is no reason to believe that the defendant will fail to appear and answer to the charges.

"The court may, on a bail release or an O.R. release, set reasonable conditions to assure the defendant's appearance.

"The court cannot set conditions that are in fact, or in effect, punishment for the alleged crime. All defendants are under our constitution, presumed innocent until proven guilty.

"If there are facts that lead the court to believe that the defendant presents a danger to the public or the victims, etc., the court can set conditions on the activities of the defendant pending trial.

"In Oregon, the leading case is *Sexson v. Merten*, 291 Or 441, [631 P2d 1367 (1981),] which held that a defendant accused of DUII who had a clear alcohol addiction problem and a record of convictions for alcohol related offenses could be required, pending trial, to abstain from the use of alcohol and be required to report to a custody officer, etc.

"So, in child sex abuse cases where there is a factual background to indicate that the defendant is a danger to his alleged victims or to other potential victims, the court can require that the defendant not contact directly or indirectly the victim or the victim's family or place himself in circumstances where the defendant might have opportunity to victimize other children.

"This usually means that the defendant will be required to have some neutral, responsible adult around if children are present.

"The conditions of release must be reasonable and based on facts. In most cases, other than child sex abuse cases, conditions are pretty standard and easily set. But in child sex abuse cases, the old paranoia and hysteria still enters. If the court tries to be reasonable and base a release decision on the facts of the particular case, accusations of being soft on child sex abusers are raised. Statistics are cited as to the probability that child sex abusers will re-offend; that abusers of females often also abuse males, etc., etc.

"The problem is that the court is not dealing with a statistic, but with a human being who is entitled to the protection of the constitution and the law until proven guilty.

"At this early stage, the court really knows very little about the evidence against the defendant.

"The prosecutors want to absolve themselves of any blame if the defendant re-offends pending trial, so they often demand conditions they know are not proper, or at least are stretching the boundaries of the law. The prosecutor also has the benefit of being aware of all of the evidence.

"The principle [*sic*] condition demanded is that the defendant not have a contact with children under age 18.

"This includes attending church where children are present, going to school functions, or entering McDonalds, etc.

"Applied to every case I do not believe this to be a proper condition, and it is almost impossible to administer.

"Conditions are also demanded to prevent an accused parent from having any contact with one or more of their own children who they are not accused of abusing and who are not witnesses. This automatically totally splits up families — sometimes for years — before there is a trial.

"These are difficult problems, not [*sic*] be avoided by a Pavlov's dog type response to every case — which is what some judges do to avoid making tough decisions and to avoid criticism. There should be no such thing as standard release conditions or release conditions based on a standard 'policy' in these cases.

"All standard release conditions are established for is to protect the prosecutor and the judge from criticism. However, the prosecutor can always point at the judge and that is how it should be. The judge makes the decision and the buck stops with the judge.

"The conditions I set in the Vaughan case were tough and reasonable. All Ms. Grote [*sic*] had to was say [*sic*] she demanded even tougher conditions and place the blame on me. Unfortunately her immaturity led her to view herself as the knight on the white charger and to set herself up as all knowing and righteous in her own position. Therefore, I am the devil to be avoided at all costs.

"If Ms. Grote [*sic*] maintains her position, the county will not have the services of the Circuit Judge elected by the voters of this county to hear felony criminal cases. Instead, Eric Valentine or a visiting judge will handle the Circuit Court criminal jurisdiction and the county will be served by a district attorney who had demonstrated a total lack of present ability, experience and maturity to handle the job of the District Attorney. I will expand on the latter with specifics in another report.

"R. D. Schenck
"Circuit Judge
"District 10"

Wallowa County Chieftain
Guest editorial
October 1, 1992

*"A judge's evaluation of the district attorney*

"This is a report on my observations and evaluation of the performance of Mary Goebel as District Attorney for Wallowa County.

"This is not something I would do in the ordinary course. However, Ms. Goebel's recent decision to disqualify me in every case she files leaves me with no alternative.

"In my letter to you regarding the disqualification issue dated August 31, 1992, I stated that I would set forth specifics upon which I based my opinion that Ms. Goebel does not have the capability, experience or maturity to handle the duties of District Attorney. I do that now.

"Since we both took office at the same time, I have worked with Ms. Goebel during the entire period of her performance in office.

"She had not won one felony jury trial.

"She still does not have a grasp of how to present a witness.

"She does not as yet have the ability to differentiate between what evidence should be presented in the State's case in chief as opposed to rebuttal.

"She does not understand the purpose of expert testimony in sex abuse cases or how to lay the proper foundation to get it admitted.

"In one sex abuse case, she had to dismiss the case three times and take the indictment back to the grand jury the fourth time before she got it right. That case has been delayed for trial for over a year because she simply did not know how to get it prepared for trial.

"She dismissed a felony sex abuse case based on an experienced defense attorney's assertion that the statute of limitation had ran [sic] out when in fact it had not.

"The District Attorney always prepares the Sentence Order and Judgment. I have had to revise every sentence order she has presented to me. Some were seriously defective.

"In two major felony cases, I have had to reject plea bargains which she agreed to. In both cases, she would have

permitted the defendant to be sentenced to optional probation for serious felony crimes — one for dealing in controlled substances and having 90 pounds of marijuana in possession, and another for assault on his wife which almost killed her. I ended up sentencing both to maximum terms in state prison.

"In the first nine months or so she was consistently late to court. I finally had to reprimand her in open court.

"If you speak to her critically, even in a positive vein, she cries.

"She has no comprehension of what a case (work) load is. She spoke to me about applying to the County for inclusion in her budget of money to hire a deputy to help her.

"The fact of the matter is that she has a workload (caseload) which is not more than 20 percent and probably closer to 10 percent of the caseload carried by the attorneys in the District Attorney's office in La Grande. There are three attorneys in La Grande, and over 200 felony cases were filed in 1991. Ms. Goebel filed eight felony cases in Wallowa County in 1991. The same percentages would hold for District Court.

"Ms. Goebel, straight out of law school is being paid around $50,000 per year with benefits above that of $10,000 per year.

"She should be able to do the county's civil work for nothing and still have less than a 50 percent workload. She resigned from doing the civil work even though she was getting paid.

"She accuses me of being biased against the State. The problem is really the opposite for me as judge. The real problem I face with Ms. Goebel representing the State is how do I insure [sic] that the State gets a fair trial? How do I insure [sic] that the people of Wallowa County have their case against the criminal defendant properly and competently presented — when it is obvious that the people's prosecutor often does not have a clue as to how to proceed?

"The judge's hands are tied for the most part. The judge must maintain impartiality, especially in criminal trials and cannot help either side present their case.

"I could go on, but I think you have the picture by now.

"Putting an attorney right out of law school into the courtroom trying felony jury cases is like putting a medical student fresh out of medical school into the operating room to do complex surgery.

"Unfortunately, Ms. Goebel is the sole attorney in the Wallowa County District Attorney's office. She had no one to guide her on a daily basis. Her case load is not sufficient for her to gain experience rapidly.

"I spent several years going to court with an experienced attorney, as his assistant, before I tried a case.

"Ms. Goebel is a lovely young lady. But she has placed herself in a position for which she has neither the training or [sic] experience to perform the duties competently.

"Unfortunately, in this instance, it is the public that will get the short end of the stick. It may also be that Ms. Goebel will be seriously damaged in her career. She has a lot of potential if she was in a position where she could be properly trained.

"The position of the District Attorney in Wallowa County has had its problems for as long as I can remember. No energetic, experienced, young career-minded attorney wants to take the job because it really offers little challenge and little opportunity for advancement. So the county has been saddled with older attorneys who were in fact not all that energetic or younger attorneys who were not all that experienced.

"Perhaps the county court needs to investigate what alternatives might be available to ensure the county has a vigorous, competent prosecutor.

*"Editor's note: Ronald D. Schenck is the [C]ircuit Court judge for Union and Wallowa counties."*

**UNIS, J.,** specially concurring in part, dissenting in part.

I agree with the court's holdings that Judge Schenck (the Judge) violated Canons 2A, 3A(4), 3A(6), and 3C(1) of the Code of Judicial Conduct (Code). I do not, however, concur in several aspects of the court's analysis in reaching those holdings. I also agree with the court's holdings that the Judge did not violate the Code in the *Hopkins* cases. I agree with the sanction imposed by the court. I dissent, however, with respect to the court's holding that the Judge may be disciplined under Canon 1. I write separately to express my concerns about the court's analysis regarding Canons 1, 2A, and 3A(6).

## CANON 1

In my view, there is no plausible basis for the court's holdings that discipline the Judge for violating Canon 1. Canon 1 provides:

> "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing, and should observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."

Canon 1 is *not* a rule of conduct under which a judge may be disciplined. Rather, Canon 1 is the basic philosophical provision of the Code, and its terms have an important bearing on all the other canons. Canon 1 performs two functions. First, Canon 1 espouses the ultimate objective of the preservation of "the integrity and independence of the judiciary," which is "indispensable to justice in our society." Second, Canon 1 is a guide to be used in interpreting the other canons in the Code. Thus, Canon 1 may not be used as the basis of a complaint in a judicial disciplinary proceeding.

## CANON 2A

I am troubled by the court's lack of analysis and discussion regarding the application of Canon 2A to the Judge's conduct in this case. The court's opinion fails to provide any guidance as to either the scope of the standard set

forth in Canon 2A or when that canon may be used as an independent basis for disciplining a judge.

Canon 2A provides:

"A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Canon 2A is cast in broad and general terms. By necessary implication, under Canon 2A a judge should avoid both professional and personal conduct that creates actual impropriety or the appearance of impropriety. It would be difficult, if not impossible, to list specifically all acts or conduct of a judge that may impair "public confidence in the integrity and impartiality of the judiciary." In my view, actual impropriety under the standard set forth in Canon 2A would include violations of law, court rules or other specific prohibitory provisions of the Code. Thus, any violation of a specific prohibitory provision of the Code arguably would be a violation of Canon 2A.

It might well be subject to question, however, whether a judge may be independently disciplined under Canon 2A when his or her impropriety is found to violate a specific rule of conduct in the Code. A judge may be disciplined under Canon 2A, however, for conduct that diminishes public confidence in the judiciary that is not specifically mentioned in the Code.[1]

Under the court's opinion, it is unclear whether the Judge is being disciplined independently under Canon 2A of the Code. I agree with the court's finding that, in essence, the conduct of the Judge impaired public confidence in the integrity and impartiality of the judiciary and, therefore, violated Canon 2A. As previously stated, I agree with the sanction imposed by the court. In arriving at what I consider to be the

---

[1] I have reservations as to whether the standard expressed in Canon 2A could serve as the basis for discipline for conduct not otherwise proscribed by the Code without further interpretation of that standard. *See In re Ainsworth*, 289 Or 479, 493, 614 P2d 1127 (1980) (the validity of a canon, which provided that "[a] lawyer should avoid even the appearance of professional impropriety" as the basis of a complaint in a disciplinary proceeding, might well be subject to question); *Megdal v. Board of Dental Examiners*, 288 Or 293, 605 P2d 273 (1980) (discussing whether the term "unprofessional conduct" provides an adequate standard for basis of professional discipline). The resolution of that issue is not necessary in this case.

appropriate sanction, however, I did not consider the Judge's violations of Canon 2A because the Judge is being disciplined for that conduct under other specific prohibitory provisions in the Code.

## CANON 3A(6)

I agree with the court's holding that disciplines the Judge under Canon 3A(6) for his letter to the editor and guest editorial that were published in the *Wallowa County Chieftain* (*Chieftain*). Despite the Judge's constitutional challenges, I agree with the court that the Judge may be disciplined for making those public statements. I cannot, however, join in the court's analysis in reaching that holding.

Canon 3A(6) provides:

"A judge should abstain from public comment about pending or impending proceedings in any court and should require similar abstention on the part of court personnel subject to the judge's direction and control. This subsection does not prohibit a judge from making public statements in the course of official duties or from explaining for public information the procedures of the court."

Any instance of judicial discipline under Canon 3A(6) raises important questions under the free-speech guarantees of Article I, section 8, of the Oregon Constitution and the First Amendment to the federal constitution.[2] With regard to Article I, section 8, this court has stated that "[u]nquestionably any rule that in terms directs persons not to make particular kinds of statements is difficult to square with constitutional guarantees of freedom of expression, particularly those of the Oregon Constitution." *In re Lasswell*, 296 Or 121, 124, 673 P2d 855 (1983).

In *In re Fadeley*, 310 Or 548, 560-61, 802 P2d 31 (1990), this court held, over my dissent, *id.* at 591-98 (Unis, J., concurring in part, dissenting in part), that the right of a

[2] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatsoever; but every person shall be responsible for the abuse of this right."

The First Amendment to the Constitution of the United States provides in part:

"Congress shall make no law * * * abridging the freedom of speech, or of the press * * *."

judge to speak, write, or print freely is subordinate to any rule of judicial conduct that has been or may be adopted by this court. Today, although the court chooses not to decide this case under that part of the *Fadeley* decision, the court seems to reaffirm that part of the *Fadeley* decision, 318 Or at 430. For the reasons stated in my separate opinion in *In re Fadeley, supra,* 310 Or at 591-98 (Unis, J., concurring in part, dissenting in part), I continue to believe that that holding in *In re Fadeley* is wrong. *See also* Armstrong, *Free Speech Fundamentalism — Justice Linde's Lasting Legacy,* 70 Or L Rev 855, 887-88 (1991) (criticizing that aspect of the *Fadeley* decision).[3]

The court holds that "even an application of 'traditional' Article I, section 8, principles to this case" yields the result that "the Judge's actions in causing the publication of the letter and the editorial posed a serious and imminent threat to the public confidence in the integrity and impartiality of the judiciary in general and of the Judge himself in particular." 318 Or at 431. The court states:

> "[T]he Judge's actions were a direct comment on the quality of prosecution to be expected in pending and impending criminal matters that were to come before him in Wallowa County. Such wilful violations of Canon 3A(6) similarly created a serious and imminent threat to the public's confidence in the integrity and impartiality of the judiciary — the value that the Canons manifestly are intended to protect. Under *In re Lasswell, supra,* imposition of a sanction on an elected public official in such circumstances does not violate that person's rights under Article I, section 8, of the Oregon Constitution. We now hold in this case that the imposition of discipline under Canons 1, 2A and 3A(6) does not violate Article I, section 8, of the Oregon Constitution." 318 Or at 431.

The court apparently finds Canon 3A(6) constitutional by "balancing" the "regulatory interest and the individual's

---

[3] I am hopeful that when all seven permanent members of this court are asked to reconsider that part of *In re Fadeley,* 310 Or 548, 560-61, 802 P2d 31 (1990), we will jettison it. In this case, four members of this court recused themselves from sitting on this case. Two of the five members of the court in this opinion are members of the Court of Appeals, sitting as Justices pro tempore.

interest" in free expression. 318 Or at 430. The court misreads *Lasswell* and misunderstands the historically-based "incompatibility exception."

The *Lasswell* decision

"did not involve a contemporary 'balance' between competing constitutional rights, and was not based on a determination that the restriction imposed a 'minimal' burden on the district attorney's right to speak. Instead, it involved a historically based exception for restrictions on expression by public employees to the extent the expression is incompatible with their public function.

"* * * * *

"Under [*State v. Robertson*, 293 Or 402, 649 P2d 569 (1982)], the validity of these restrictions does not turn on whether the right of the employees to free expression is outweighed by the public interest served by the restrictions. That is, it does not turn on whether an appropriate balance has been struck between these 'competing' interests. It turns, instead, on whether the restrictions are based on a historically recognized exception for public employees that it is incompatible with their public function, and on whether the restrictions are wholly confined within this exception." Armstrong, *supra*, 70 Or L Rev at 890-91 (footnotes omitted).

As I explained in *In re Fadeley, supra,* 310 Or at 582 (Unis, J., concurring in part, dissenting in part):

"The incompatibility between the particular privileged speech and the performance of one's special role or function need not be spelled out in the text of the enactment, but it must be shown by the government to be a 'highly likely' effect. Incompatibility, which is always related to state action, is *assessed at the time the individual chooses what to speak or write.* It is not simply assumed at the time of the enactment of the governmental provision. Incompatibility cannot, in other words, be legislated in the abstract or by a generalized finding; it must be shown to be a 'highly likely' effect in a concrete case. 'Our cases under Article I, section 8, preclude using apprehension of unproven effects as a cover for suppression of undesired expression * * *.' *City of Portland v. Tidyman,* [306 Or 174, 188, 759 P2d 242 (1988)]. A mere likelihood of incompatibility will not, therefore, suffice." (Emphasis in original; some citations omitted.)

In *In re Lasswell, supra*, this court articulated the "incompatibility exception" under Article I, section 8. In *Lasswell*, this court recognized that speech that could not constitutionally be prohibited outright may nevertheless, under narrowly-defined circumstances, be found incompatible with the performance of one's special role or function. In *Lasswell*, this court held that a lawyer disciplinary rule could constitutionally restrict *prosecutors* from commenting publicly on pending cases with which they are associated *if the rule was narrowly limited to actual incompatibility between the speech and the prosecutor's official function*, including his responsibility to preserve the person's right to a fair trial by an impartial jury.

Article I, section 8, of the Oregon Constitution would preclude the enactment of an outright prohibition against public comment by persons *generally* or against publication by those to whom such comment is made. *See In re Lasswell, supra*, 296 Or at 124 (citing cases). Canon 3A(6) is, however, directed at judges, not at persons generally. The point of Canon 3A(6) is not restraint of free expression by judges because they are judges. In my view, a canon that requires a person who becomes a judge to surrender all speech rights guaranteed by Article I, section 8, of the Oregon Constitution could not survive a challenge under that constitutional provision. *In re Fadeley, supra*, 310 Or at 590 (Unis, J., concurring in part, dissenting in part). *See In re Richmond*, 285 Or 469, 474-75, 591 P2d 728 (1979) (same principle stated for lawyers). Rather, Canon 3A(6) addresses the incompatibility between a judge's official function, including his or her responsibility to promote public confidence in the impartiality and integrity of the judiciary, and speech that, although privileged against other professional sanctions, vitiates the proper performance of that function under the circumstances of the specific case. In short, a judge is not denied freedom of expression or freedom to speak, write, or publish; but when a judge exercises official responsibility in the performance of the judicial office, he or she also undertakes the professional responsibility to act in a manner compatible with the judicial office in what he or she says or writes.

Canon 3A(6) survives the Judge's constitutional challenge *if it is narrowly construed so as to limit its coverage,*

in the words of Article I, section 8, to a judge's "abuse" of the right "to speak, write, or print freely on any subject whatever." *In re Lasswell, supra.* Thus, the Judge may be disciplined under Canon 3A(6) only if a "highly likely" effect of the Judge's public statements was actual harm to public confidence in the impartiality and integrity of the judiciary.

I am satisfied by clear and convincing evidence that some of the Judge's statements that were published in the *Chieftain*, viewed in context, were statements about pending or impending cases and that actual harm to public confidence in the impartiality and integrity of the judiciary was a "highly likely" effect of those statements.

I agree with the court's holding regarding the Judge's arguments under the First and Fourteenth Amendments, although my analysis of those issues would be somewhat different. *See Shockey v. City of Portland*, 313 Or 414, 435-41, 837 P2d 505 (1992) (Unis, J., concurring in part, dissenting in part) (setting forth analytical framework for determining whether public employee speech is constitutionally protected under the First Amendment).