914 P.2d 1028

**In the Matter of Hon. Benjamin S. EAST-BURN, District Judge, Eleventh Judicial District Court, State of New Mexico.**

No. 23018.

Supreme Court of New Mexico.

April 10, 1996.

Benjamin S. Eastburn, Aztec, Pro Se.

## OPINION

PER CURIAM.

1. On January 23, 1996, we disciplined the Honorable Benjamin S. Eastburn, District Judge of the Eleventh Judicial District, for his direct contempt of this Court. We suspended him from his duties for a period of one year. Under the terms of the order of suspension, after thirty days without pay, Judge Eastburn has now returned to office on probation for eleven months. This opinion serves as a formal censure of Judge Eastburn and explains the circumstances and rationale underlying our imposition of sanctions.

2. Judge Eastburn believes that a party's election to excuse him impinges upon his constitutional authority as a judicial officer elected by the people of the district that he serves. Consequently, he believes he may disobey the laws and rules which allow a party to peremptorily excuse the district judge before whom a case is pending. Civil disobedience, militant protest, inflammatory rhetoric, and other forms of resistance to established authority have had an important role in the history of democracy. Nevertheless, a judge's oath to support the law constrains his or her actions. A judge may not disobey state statutes or the rules and orders of the highest court he or she has sworn to support.

3. Further, a judge must maintain or even strive to enhance public confidence in the integrity of the judiciary through his or her conduct or language. A judge should not engage in conduct or language calculated to erode public confidence. Although Judge Eastburn has vehemently denounced the New Mexico judicial system generally, we understand the peremptory disqualification of judges to be the sole focus of his concern.

We begin, therefore, with a look at the law of peremptory excusal and Judge Eastburn's early involvement as the subject of rulings and writs issued on that subject by this Court.

■ 4. *The law of peremptory excusal and early superintending control of Judge Eastburn.* Beginning with the first territorial legislature in 1851, the laws of New Mexico have provided for the peremptory disqualification of the district judge before whom an action or proceeding is to be tried or heard. *See State ex rel. Hannah v. Armijo,* 38 N.M. 73, 74–75, 28 P.2d 511, 511–12 (1933) (noting history of legislation permitting disqualification). Disqualification statutes have been peremptory in nature in that the legislature has required no allegation or proof of facts to support disqualification. *Id.* at 75, 28 P.2d at 512. Further, "[n]o discretion is vested in the judge against whom the affidavit is filed as to his disqualification." *Id.* at 76, 28 P.2d at 512.

5. The current statute provides in relevant part:

A party ... shall have the right to exercise a peremptory challenge to the district judge before whom [an] action or proceeding is to be tried and heard.... After the exercise of a peremptory challenge, that district judge shall proceed no further. Each party to an action or proceeding may excuse only one district judge pursuant to the provisions of this statute.

NMSA 1978, § 38–3–9 (Repl.Pamp.1987). A litigant must file an affidavit of disqualification within ten days following the time the cause is at issue, the deadline for filing a jury demand, or the assignment of the judge sought to be disqualified, whichever is latest. NMSA 1978, § 38–3–10 (Repl.Pamp.1987).[1]

6. While under earlier versions of the disqualification statutes it was the challenge of prejudice (not the fact of prejudice) that disqualified a judge, *see Armijo,* 38 N.M. at 79, 28 P.2d at 514, our current statutes and rules provide for a right of peremptory excusal without reference to bias or prejudice. In *Armijo* this Court considered and rejected without dissent a challenge on separation-of-powers grounds to the constitutionality of the peremptory excusal for alleged bias. *Id.* at 82–83, 28 P.2d at 516. In *JMB Retail Properties Co. v. Eastburn,* 114 N.M. 115, 835 P.2d 831 (1992), Judge Eastburn similarly challenged the constitutionality of the current statutes and rules.

---

1. Accordingly, our rules of civil procedure for the district courts provide in relevant part:

 A. **Limit on excusals or challenges.** No party shall excuse more than one judge. A party may not excuse a judge after the party has requested that judge to perform any discretionary act other than an order for free process or a determination of indigency.

 B. **Procedure for excusing a district judge.** A party may exercise the statutory right to excuse the district judge before whom the case is pending by filing with the clerk of the district court a peremptory election. The peremptory election to excuse must be:

 (1) signed by a party plaintiff or that party's attorney and filed within ten (10) days after the latter of:

 (a) the filing of the complaint; or

 (b) mailing by the clerk of notice of assignment or reassignment of the case to a judge; or

 (2) signed by any other party, or that party's attorney, and filed within ten (10) days after the latter of the filing of the first pleading or motion pursuant to Rule 1–012 by that party or of mailing by the clerk of notice of assignment or reassignment of the case to a judge.

SCRA 1986, 1–088.1 (Cum.Supp.1995) (peremptory challenge to a district judge in a civil case). Similarly, the rules of criminal procedure provide in relevant part:

 A. **Definition of parties.** "Party", as used in this rule, shall mean: a defendant, the state or an attorney representing the defendant or the state. A party may not excuse a judge after the party has requested that judge to perform any discretionary act.

 B. **Extent of excuse or challenge.** No judge may be excused from conducting an arraignment or first appearance or setting initial conditions of release. No party shall excuse more than one judge.

 C. **Procedure for excusing a district judge.** The statutory right to excuse the judge before whom the case is pending must be exercised by a party filing a peremptory election to excuse with the clerk of the district court within ten (10) days after the later of:

 (1) arraignment or the filing of a waiver of arraignment; or

 (2) service by the clerk of notice of assignment or reassignment of the case to a judge.

SCRA 1986, 5–106 (Cum.Supp.1995) (peremptory challenge to a district judge in a criminal case).

7. In *JMB Retail Properties Co.* we set forth Judge Eastburn's position on the issue of constitutionality, although we found it unnecessary to decide the case on constitutional grounds. The assignment of a judge was there argued by Judge Eastburn to be the essence of judicial power under the Separation of Powers Clause of the New Mexico Constitution. 114 N.M. at 116–17, 835 P.2d at 832–33. He also had unsuccessfully made this argument in the earlier case of *Johnson v. Eastburn*, No. 17598 (N.M. Mar. 23, 1988), in which we issued a writ of prohibition against Judge Eastburn restraining him from proceeding further in a criminal case in which we found him to have been disqualified in a timely manner.

8. In November 1992, after we had filed our opinion in *JMB Retail Properties Co.*, the district attorney for the Eleventh Judicial District petitioned this Court in two separate cases for extraordinary relief from Judge Eastburn's refusal to recognize elections of peremptory excusal. *State ex rel. Whitehead v. Eastburn*, Nos. 20878 & 20879 (N.M. Nov. 23, 1992). On June 3, 1992, Judge Eastburn had entered a miscellaneous administrative order entitled in the Matter of Peremptory Elections to Excuse Judge for Division I (all matters, civil, criminal, domestic, etc.). That order read: "ANY PEREMPTORY ELECTION TO EXCUSE Division I—the undersigned judge—will *not* be honored until further Order. /s/ Benjamin S. Eastburn, District Judge, Div. 1." This Court granted peremptory writs of superintending control in both cases, directing Judge Eastburn "to recognize the petitioner's peremptory election to excuse you from presiding over the proceeding now pending before the court ... and rescind your administrative order of June 3, 1992." *Id.*[2]

9. *The direct contempt.—Facts and proceedings.* Thereafter, Judge Eastburn began the practice of recusing himself from cases reassigned to him following the peremptory challenge of any other judge of the eleventh judicial district. His "Recusal and

Notice Following Peremptory Challenge" would read: "The Docket of this case reflects that a peremptory challenge has been exercised thereby removing a constitutionally-qualified District Judge from conducting these proceedings. For this reason, the undersigned District Judge recuses himself from further participation in this cause."

10. On April 12, 1995, in *State v. Suvall*, No. CR 95–101 (N.M.Dist.Ct., 11th Dist. 1995), Judge Eastburn entered a recusal and notice following the peremptory challenge of another judge of the district and reassignment of the case to Judge Eastburn. The defendant in that criminal case filed a motion requesting that Judge Eastburn reconsider his recusal decision. The motion cited authority with respect to Suvall's constitutional and statutory right to have excused the other judge by peremptory challenge. He urged that Judge Eastburn, on reassignment of the case to him, recognize his solemn duty to perform the judicial role mandated by statute without recusal except for compelling constitutional, statutory, or ethical reasons for doing so, arguing that "a judge's duty to sit where qualified is equally as strong as his duty not to sit where disqualified." *E.g., Gerety v. Demers*, 92 N.M. 396, 400, 589 P.2d 180, 184 (1978).

11. On June 21, 1995, Judge Eastburn filed the following notice:

## NOTICE UPON RECONSIDERATION

The undersigned executed and entered his form "Recusal and Notice Following Peremptory Challenge" upon routine presentation by the Division Administrative Assistant, who is instructed so to do for all cases re-assigned to this Division in which any Judge [has] been removed by Peremptory Challenge. Because of the "Motion to Reconsider, etc.", he now has actually reviewed the file, and FINDS this case, in its brief procedural history, to be archetypical of the institutional sleaze that besets this

---

**2.** Earlier, on October 13, 1992, without having ordered rescission of the administrative order of June 3, we likewise issued a writ to Judge Eastburn ordering him to proceed no further in a criminal case in which, based on the administra-

tive order, the clerk of the district court had entered a notice of the denial of a peremptory election to excuse. *See Thompson v. Ireland*, No. 20823 (Oct. 13, 1992).

farcical judicial system and CONCLUDES that his recusal is most appropriate.

If Mr. Schoenfeld truly believes that there is an enforceable duty on the part of the undersigned to hear this case, then he is urged to seek a writ. If that is done, the Supreme Court will be alternatively urged by me to discard the peremptory challenge rule, or dared to order me to hear this case.

/s/ Benjamin S. Eastburn
BENJAMIN S. EASTBURN
District Judge

12. On July 3, 1995, Suvall petitioned this Court for a writ of superintending control or, in the alternative, for a writ of mandamus requiring Judge Eastburn to exercise his constitutionally and statutorily mandated judicial function to hear the case. Judge Eastburn personally filed his response on July 25, 1995, concluding:

This Supreme Court is challenged to allow the trial courts to manage their own affairs, and to have the fortitude of Stowers, Sosa, Riordan, et al. in *Gesswein v. Galvan*, 100 N.M. 769, 676 P.2d 1334 (S.Ct. 1984) [observing disqualification statute is procedural in nature and subject to Court's rule-making authority under separation of powers]. As a qualified elector of the State of New Mexico and a registered voter in San Juan County, and as a lawyer who has been admitted to practice in four states, plus several federal jurisdictions, it is Respondent's opinion that the citizens of New Mexico are disserved by the sleaziest judicial system in the United States.

On July 26, 1995, this Court granted the petition and ordered that a writ of mandamus issue. *Suvall v. Eastburn*, No. 23018 (N.M. July 26, 1995).

13. On December 1, 1995, in *State v. Suvall*, No. CR 95–101 (N.M.Dist.Ct., 11th Dist. 1995), Judge Eastburn filed the notice that constitutes the act for which we ordered him to appear before this Court to show cause why we should not hold him in contempt.

**NOTICE**

IT APPEARS from the Order of the Supreme Court that a decision has been made to allow the lawyers, instead of the judges, to control the caseload (the separation of powers under the New Mexico Constitution, and the guarantee of a republican form of government under the United States Constitution, notwithstanding). As this circumstance does not resolve the objection based in conscience to hearing this case, notice is hereby given that the Order will not be honored.

/s/ Benjamin S. Eastburn
BENJAMIN S. EASTBURN
District Judge

On December 14, 1995, in consequence of this notice in *State v. Suvall*, this Court ordered Judge Eastburn

to appear in person on **January 23, 1996, at 10:00 a.m.** and show cause, if any you have, why you should not be held in contempt for your failure to comply with this Court's Writ of Mandamus issued July 26, 1995, which required you to reinstate on your docket and hear the case of *State v. Suvall*, CR 95–101, and to show cause, if any, why you should not be suspended or removed from office permanently; and

IT IS FURTHER ORDERED that you shall respond in writing on or before **January 3, 1996.**

14. On January 3, 1996, Judge Eastburn responded, in material part, as follows:

First.... What has brought us to loggerheads is a difference of opinion about the state of the New Mexico judiciary, which I think is sad, and our differing views on the issue of who should control our caseloads....

Second.... [I]t is apparent that the Supreme Court wishes to remove me from office for not choosing to allow an Albuquerque lawyer to jerk the McKinley County judicial system around on behalf of a known drug dealer. This may make some cockeyed lawyer sense within the New Mexico judicial system, but it would appear bizarre to someone outside the system applying common sense....

Third. There is clearly an undercurrent here of central (Santa Fe) control of the various districts as opposed to. locally elected, autonomous control by Constitu-

tional officers. I don't believe that the local electorate with its Republican sense of accountability and general disdain for lawyers, shares the philosophies of the Democrat Supreme Court, its burgeoning [Administrative Office of the Court] bureaucracy, and election campaigns financed by lawyers.

15. On January 23, 1996, Judge Eastburn appeared before the Court and elaborated on his response, stating:

Well, I'm a Republican, you're all Democrats. I've never taken a penny from a lawyer in a political endeavor, I know what money has been paid to the various campaigns here.... [T]he Democrats seem to strive for central control and the Republicans seem to strive for decentralization.... I see a lot of money spent around here and, I mean, I think that's there it is. One of the things I'm going to do today is meet with some legislators about an amendment to the Constitution that ... in multicounty judicial districts ... the resident judge ... [does not] run elsewhere unless in that district there are counties without resident judges....

Further, Judge Eastburn conceded that, "as a matter of conscience, ... I did defy the order to see what would happen and here I am." With respect to the language used in his response filed January 3, 1996, Judge Eastburn explained:

I'm trying to communicate with people who, I'm afraid, are losing their faith in this system and to use courthouse language makes me appear, I think, as somebody who is a defender of the system. I'm a defender of justice.... [T]he audience wasn't for lawyers, the audience was for the public because I wanted to separate myself from a process that ... ignores some serious problems with this system and that's why I chose those words.... I'm proud of my ability to communicate, but the term "sleazy" is something that's a vernacular word, which means something less than a forthright way to achieve an end which may or may not be justice and ... I didn't want to get back to the merits and suggest that we're here for anything

other than the contempt that I had for this Court's order....

16. —*The Code of Judicial Conduct.* While the specific act for which we discipline Judge Eastburn is his statement of December 1, 1995, filed in *State v. Suvall* to give notice that our writ of mandamus ordering him to hear that case "will not be honored," the significance of that act of self-confessed contempt is colored by the history of Judge Eastburn's intransigence and vituperative attacks on peremptory excusal in disdainful language such as "institutional sleaze that besets this farcical judicial system." The New Mexico Code of Judicial Conduct mandates that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." SCRA 1986, 21–200(A) (Repl. Pamp.1995). As used in the Code, " 'law' means court rules, statutes, the United States Constitution, the Constitution of the State of New Mexico and decisional law of this jurisdiction." SCRA 1986, 21–001(E) (Repl.Pamp.1995). Under the Code, "A judge shall hear and decide matters assigned to the judge except those in which disqualification is required." SCRA 1986, 21–300(B)(1) (Repl.Pamp.1995).

17. *Propriety of contempt proceedings.* "Violations of any of the rules of the Code of Judicial Conduct by incumbent judges shall be investigated, proceeded upon and disposed of ... by the Supreme Court of New Mexico acting under its powers of contempt and superintending control." SCRA 1986, 21–900(A). In *In re Avallone,* 91 N.M. 777, 778, 581 P.2d 870, 871 (1978), the Court of Appeals had directed the attorney to show cause why he should not be held in contempt of court for his failure to comply with appellate rules. From a finding of contempt, the attorney appealed to this Court. We held that the "[f]iling of documents occurs in the constructive presence of the court and may be a direct contempt if either the document or the act of filing is contemptuous." *Id.* We affirmed the Court of Appeals, holding that when the conduct of the attorney was directed toward the procedures employed by the appellate court as a court of review, that

court properly initiated contempt proceedings by a show cause order. Thereafter, in *State v. Pothier*, 104 N.M. 363, 721 P.2d 1294 (1986), this Court relied on U.S. Supreme Court authority for the proposition that "the prosecution of contempt, *except of that committed in open court*, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense explanation." *Id.* at 366, 721 P.2d at 1297 (quoting *Bloom v. Illinois*, 391 U.S. 194, 205, 88 S.Ct. 1477, 1484, 20 L.Ed.2d 522 (1968)). This is the authority and process under which we have proceeded against Judge Eastburn.

■ 18. *Precedent.* The Supreme Court of Michigan has considered contumacious judicial conduct similar to the conduct of Judge Eastburn. In *In re Hague*, 412 Mich. 532, 315 N.W.2d 524, 527–28, 536 (1982), the chief judge of a circuit court had issued an order of superintending control that Judge Hague cease dismissing complaints based upon his constitutionally rooted "ideological war" against a certain ordinance. Despite four such orders of superintending control, Judge Hague continued to "frustrate enforcement of this ordinance with every means at his disposal." *Id.* 315 N.W.2d at 536. Two principles enunciated in *Hague* apply here: "an order entered by a court with proper jurisdiction must be obeyed even if the order is clearly incorrect"; and "availability of an appeal [from the trial court's disobedience] in the individual case does not preclude superintending relief when that procedure does not provide an adequate remedy." *Id.* at 529.

> Judge Hague knew exactly what the superintending control orders forbade him to do, and did so anyway.... [He] had this to say, on the record, from the bench, about the Court of Appeals: ".... Tell them [the Michigan Court of Appeals] what I'm doing. I don't have to jump through a hoop for the Court of Appeals. I'm an elected judge."

*Id.* at 530.

19. Speaking about Judge Hague's blatant and repeated refusals to obey superintending control orders, the Supreme Court of Michigan noted that "[p]ublic confidence in the integrity and impartiality of the judiciary can only be eroded by the spectacle of a judge refusing to follow the law." *Id.* at 531. Commenting on the limitations imposed upon Judge Hague by the law, the court observed that

> [w]here ... a judge's decision striking down a law as unconstitutional is directly contrary to appellate precedent of which he is aware and obviously based upon his widely publicized personal belief about what the law should be rather than what it is, the public perception of impartiality of the justice system is seriously harmed....
>
> ... A judge who may disagree with the appellate authority must, nevertheless, lay aside his own opinion of the validity of the law and dispose of the cases before him in accordance with the precedent. Whatever his contrary personal view of appellate authority, a judge is not free to disregard it.

*Id.* at 532. Finally, guided by the above-quoted principles, the court concluded that

> [Judge Hague's] depth of conviction that the ordinance penalties are unjust blinded him to an appreciation of the limits of his adjudicative role in the criminal justice process, and moved him to deny the authority of higher courts who declared he was in error and ultimately led him to disobey those orders because he did not agree with them....
>
> It was in his inability to separate the authority of the judicial office he holds from his personal convictions that Judge Hague lost his way. In the particulars described, unable to see that he was the servant of the law and not its embodiment, he set himself above it.
>
> ....
>
> Judge Hague's disobedience of superior court orders [and] refusal to follow settled and binding case precedent ... was repeated and defiant and, because of the widespread publicity given it within the courtroom and in the community at large, can only have seriously damaged public esteem for the judiciary in general, engendered disrespect for the law, exposed the courts to obloquy, contempt, censure and

**538**

reproach and brought ridicule upon Judge Hague as a judicial officer.

*Id.* at 536. The Supreme Court of Michigan suspended Judge Hague without pay for sixty days. *Id.* at 537.

 20. There are, of course, constitutional limitations on the regulation of Judge Eastburn's speech. *See Scott v. Flowers,* 910 F.2d 201, 212–13 (5th Cir.1990) (public criticism by elected justice of the peace who alleged unfairness in the judicial de novo appeals system was not shown to "impede the goals of promoting an efficient and impartial judiciary," interests "ill served by casting a cloak of secrecy around the operations of the courts"); *cf. Carrillo v. Rostro,* 114 N.M. 607, 620–22, 845 P.2d 130, 143–45 (1992) (discussing the legitimate interests of state in regulating public employee's speech). These limitations, however, do not extend to the publication of language that does pose a serious and imminent threat to the public's confidence in the integrity and impartiality of the judiciary in general and of the judge in particular. *In re Schenck,* 318 Or. 402, 870 P.2d 185, 203–06 (considering state and federal constitutional challenges to judicial discipline), *cert. denied, Schenck v. Commission on Judicial Fitness & Disability,* ⸺ U.S. ⸺, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). Judge Schenck was a circuit court judge suspended for, among other things, refusal to disqualify himself and making related public comments about what he characterized as attempts "to disrupt the administration of the court."

21. The court explained that judges are disciplined primarily to preserve public confidence in the integrity and impartiality of the judiciary. *Id.* 870 P.2d at 207. Thus disciplining judges serves to educate and inform the judiciary and the public that certain types of conduct are improper and will not be tolerated. Discipline of a judge also serves to deter the disciplined judge as well as other judges from repeating the type of conduct sanctioned. *Id.* The Oregon Supreme Court suspended Judge Schenck from office without pay for forty-five days. *Id.* 870 P.2d at 210.

22. *In re Kading,* 74 Wis.2d 405, 246 N.W.2d 903, 904 (1976), is a case in which the Wisconsin Supreme Court had previously rejected the constitutional challenges made by Judge Kading to a requirement of the Code of Judicial Ethics that the judge file a financial disclosure statement. The Court concluded that Judge Kading properly had been given a reasonable time in which to comply, and when he failed to do so, the Court severely reprimanded him. *Id.* Judge Kading was unmoved, and the Court entered an order for him to show cause why he should not be held in contempt. As in the case of Judge Eastburn, Judge Kading argued that his conduct was not contumacious because he was acting on the belief that his conduct was constitutionally correct. *Id.* 246 N.W.2d at 905.

As to his first claim, Judge Kading cites no case in support of the proposition that sincerity is relevant in determining whether a contempt has been committed by refusal to comply with a court rule or order. The general rule is to the contrary. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). Moreover, his constitutional arguments were made and ruled on adversely to him in the 1975 proceeding, and thus he cannot in 1976 claim good faith in refusing to file asserting similar objections.

*Id.*

23. *Conclusion.* Respect for the law is the lifeblood of our nation—a nation ruled by law, not individuals. Critical to this respect is the perception of judges as servants of the law. It is by reason of this perception that the people willingly support the independence of the judiciary. It is the independence of judges to follow the precepts of law sheltered from the windstorms of society that is the essence of justice. As Chief Justice Baca admonished Judge Eastburn in open court, judges who, as self-perceived defenders of justice, set themselves above the law, to promote a personal belief about what the law should be, do a disservice to justice.

 24. By giving written notice that he would not honor the order of this Court, Judge Eastburn expressed the contempt that he had for this Court's lawful mandate that he hear the case of *State v. Suvall.* Judge

Eastburn communicated this contempt to the public in a manner calculated to undermine the integrity of the New Mexico judicial system in defiance of his solemn obligation to respect and comply with the law. While Judge Eastburn belatedly has apologized, he has continued to justify his defiance in the most contumacious of language. By suspending him and placing him on probation, and by issuing this public censure, we trust that Judge Eastburn will be deterred from like conduct in the future and that the judiciary and public will understand that judicial conduct disrespectful of the law is improper and will not be tolerated.

25. **IT IS SO ORDERED.**