2007-NMSC-056

172 P.3d 605

Inquiry Concerning a Judge No. 2006-028.

In the MATTER OF WILLIAM
A. VINCENT, JR.

No. 27,266.

Supreme Court of New Mexico.

Nov. 9, 2007.

James A. Noel, Elizabeth A. Garcia, Albuquerque, NM, for Judicial Standards Commission.

Titus & Murphy Law Firm, Victor A. Titus, H. Steven Murphy, Farmington, NM, for Respondent.

## OPINION AND FORMAL REPRIMAND

PER CURIAM.

{1} This is a Judicial Standards Commission proceeding involving San Juan County Magistrate Judge William A. Vincent, Jr. (Respondent). We are called upon to decide the constitutionality of the prohibition in our Code of Judicial Conduct against the public endorsement of a political candidate by a judge, commonly referred to as an "endorsement clause," in light of the United States Supreme Court's opinion in *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). For the reasons that follow, we conclude that New Mexico's endorsement clause is constitutional. Accordingly, we adopt the Commission's recommendation of discipline and issue this formal reprimand.

## BACKGROUND

{2} The facts of this case are limited and undisputed. Respondent publicly endorsed Bill Standley for reelection as mayor of Farmington, New Mexico. Specifically, Respondent authorized the use of his name for an endorsement that was published in a local

Farmington newspaper. Respondent's name appears in the endorsement as part of a list of Farmington citizens endorsing Mayor Standley for reelection, but the endorsement does not explicitly identify Respondent as a magistrate court judge. In New Mexico, magistrate court judges are selected in partisan elections conducted every four years. Respondent was not running for reelection at the time he publically endorsed the mayor.

{3} The Commission filed a petition for discipline, alleging that Respondent violated two provisions of the Code of Judicial Conduct by publicly endorsing a candidate for mayor in a Farmington newspaper. *See* Rule 21–200(B) NMRA ("A judge shall not lend the prestige of judicial office to advance the private interest of the judge or others") and Rule 21–700(A)(3)(b) NMRA ("A judge shall not ... publicly endorse or publicly oppose a candidate for public office through the news media or in campaign literature[.]"). While admitting that he endorsed a candidate for public office, Respondent contests the imposition of any discipline on the grounds that his conduct is constitutionally protected free speech. Although Respondent relies on both the federal and state constitutions, he does not argue that the state constitution grants him greater protection. Accordingly, our analysis in this case is limited to the protections afforded by the United States Constitution. *See State v. Walters*, 1997–NMCA–013, ¶ 9, 123 N.M. 88, 934 P.2d 282 (limiting analysis to federal constitutional protections where appellant relied on federal law and only made a passing reference to the New Mexico Constitution); *see also Maso v. New Mexico Taxation & Revenue Dep't*, 2004–NMSC–028, ¶ 5, 136 N.M. 161, 96 P.3d 286 (finding no reason not to extend interstitial approach beyond the criminal context).

**DISCUSSION**

{4} By publicly endorsing Mayor Standley for reelection, Respondent's conduct plainly violated Rule 21–700(A)(3) of the Code of Judicial Conduct, and several courts in other jurisdictions have imposed discipline against judges who have engaged in similar political endorsements in violation of similar ethical prohibitions. *See, e.g., In re Glick-*

*stein*, 620 So.2d 1000 (Fla.1993); *Office of Disciplinary Counsel v. Capers*, 15 Ohio St.3d 122, 472 N.E.2d 1073 (1984); *In re Martin*, 315 S.C. 370, 434 S.E.2d 262 (1993). However, those cases specifically addressing violations of similar endorsement clauses were decided prior to the United States Supreme Court's decision in *White*. We therefore proceed to consider the impact of *White* under the circumstances of this case.

{5} In *White*, the Supreme Court considered whether a Minnesota judicial conduct rule, commonly referred to as an "announce clause," violated the First Amendment by prohibiting a judicial candidate from announcing his views on disputed legal or political issues. *Id.* at 768, 122 S.Ct. 2528. In addressing the issue, the Court applied a strict scrutiny analysis, noting that "the announce clause both prohibits speech on the basis of its content and burdens a category of speech that is 'at the core of our First Amendment freedoms'—speech about the qualifications of candidates for public office." *Id.* at 774, 122 S.Ct. 2528 (quoting *Republican Party of Minn. v. Kelly*, 247 F.3d 854, 861 (8th Cir.2001)). To survive strict scrutiny, the announce clause must be narrowly tailored to serve a compelling state interest. *Id.* at 775, 122 S.Ct. 2528. To be narrowly tailored, the announce clause must not "unnecessarily circumscrib[e] protected expression." *Id.* (quoting *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982)).

{6} The ostensible compelling state interest identified in *White* was the preservation of impartiality, and the appearance of impartiality, of the judiciary. *Id.* To determine whether the announce clause was narrowly tailored to serve that compelling state interest, the Court first sought to define impartiality. *Id.* In this regard, the Court set forth three different meanings of impartiality: (1) a lack of bias for or against either party to a proceeding; (2) a lack of preconception in favor of or against a particular legal view; or (3) a general open-mindedness to considering views opposed to the judge's preconceptions. *Id.* at 775–78, 122 S.Ct. 2528. Without specifically deciding which form of impartiality the announce clause

sought to promote, and without specifically deciding whether any particular form of impartiality rose to the level of a compelling state interest, the Court nevertheless concluded that, regardless of the type of impartiality that the announce clause may have been intended to promote, it failed to meet the strict scrutiny standard. *Id.* at 781, 122 S.Ct. 2528.

{7} While *White* is widely seen as changing the legal landscape regarding the free speech rights of judges, it is factually distinguishable from this case in two important ways. As noted above, *White* involved the announce clause, whereas this case involves what is often referred to as an endorsement clause, commonly found in many codes of judicial conduct. *See In re Raab*, 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287, 1290 (2003) (distinguishing *White* because it addressed the announce clause rather than the endorsement clause). In addition, *White* examined the free speech rights of a judicial candidate involved in his own election, whereas this case involves the free speech rights of a sitting judge to endorse another's political candidacy. *See In re Dunleavy*, 838 A.2d 338, 351 (Me.2003) (distinguishing *White* because the challenged political restrictions in Maine's judicial conduct code applied to sitting judges as opposed to judicial candidates). For these reasons, we believe *White* does not apply to the circumstances of this case.

■ {8} That said, we recognize that there are nevertheless constitutional limits on the regulation of judicial speech. *See In re Eastburn*, 121 N.M. 531, 538, 914 P.2d 1028, 1035 (1996). "These limitations, however, do not extend to the publication of language that does pose a serious and imminent threat to the public's confidence in the integrity and impartiality of the judiciary in general and of the judge in particular." *Id.* In determining whether the endorsement clause in our Code of Judicial Conduct has breached such constitutional limits, we must balance Respondent's First Amendment right to comment on matters of public interest against the interest of the judiciary in regulating the speech of its judges to promote the appearance and reality of impartiality within the judiciary. *See generally Connick v. Myers*, 461 U.S. 138, 150–54, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (recognizing the need to balance the state's interest in fulfilling its responsibilities to the public, the extent to which the speech in question involves a matter of public concern, and the manner, time, place, and context of the speech); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (describing the need to balance the public employee's interest "in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"); *see also In re Conduct of Schenck*, 318 Or. 402, 870 P.2d 185, 204 (1994) (applying the "traditional public employee free-speech analysis" in judicial disciplinary proceeding).

{9} We begin by recognizing that, as an elected official, Respondent's opinion about the best candidate for mayor may be a matter of legitimate public concern. *See White*, 536 U.S. at 781–82, 122 S.Ct. 2528 (" '[D]ebate on the qualifications of candidates' is 'at the core of our electoral process and of the First Amendment freedoms,' not at the edges. . . . 'The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.' ") (quoting *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 222–23, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) and *Wood v. Georgia*, 370 U.S. 375, 395, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962)) (internal quotation marks and citations omitted). We also recognize that Respondent, like any other citizen, has an interest in commenting upon and supporting the particular political candidates of his choosing. At the same time, however, the State has a competing, and we believe compelling, interest to ensure that there is impartiality, and the appearance of impartiality, within its judiciary. In balancing these competing interests, we conclude that the endorsement clause is a constitutional limit on Respondent's right to support the political candidates of his choosing. *See United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers AFL–CIO*, 413 U.S. 548, 579, 93

S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding constitutionality of the Hatch Act's prohibitions against federal employees publicly endorsing partisan candidates for public office); *accord Raab,* 763 N.Y.S.2d 213, 793 N.E.2d at 1290–91 (likening its decision upholding the constitutionality of an endorsement clause to the decision in *Letter Carriers* ).

{10} As noted in *Schenck,* evaluating the constitutionality of restrictions on the political speech of a judge "does not fit neatly into the existing analytical framework for First Amendment analysis." *Schenck,* 870 P.2d at 204. Selecting the appropriate framework for analysis has become even more difficult since *White.* *See In re Hecht,* 213 S.W.3d 547, 591–92 (Tex.Sp.Ct.Rev.2006) (McClure, J., concurring) (noting that a *Pickering* balancing approach to the political speech of judges may now be questionable in light of *White); see also White,* 536 U.S. at 796, 122 S.Ct. 2528 (Kennedy, J., concurring). Even if we were to apply the strict scrutiny test announced in *White,* we would nevertheless conclude that our endorsement clause is constitutional. Although *White* focused on the application of Minnesota's announce clause to judicial candidates, if we were to apply the strict scrutiny analysis in *White* to the circumstances of this case, we would need to determine whether our endorsement clause is narrowly tailored to serve a compelling state interest. *See White,* 536 U.S. at 775, 122 S.Ct. 2528. Because of the uncertainty that exists regarding the appropriate constitutional analysis to apply in this case, we will now consider whether there is a compelling state interest at the core of our endorsement clause, and, if so, whether the clause is narrowly tailored to achieve that end.

{11} The compelling state interest advanced by the Commission in support of our endorsement clause is the State's interest in promoting impartiality and the appearance of impartiality within the judiciary. As previously noted, without deciding whether impartiality or its appearance was a compelling state interest, the Court in *White* identified three possible variants of what is often meant by impartiality. Of the three, the one identified in *White* that appears to us most likely to rise to the level of a compelling state interest is the Court's conception of impartiality that envisions a lack of bias for or against either party to a proceeding. *See White,* 536 U.S. at 775–76, 122 S.Ct. 2528. Since *White,* at least one other court has recognized this meaning of impartiality as a compelling state interest. *See Dunleavy,* 838 A.2d at 351 (recognizing that the State has a compelling interest in preserving judicial impartiality and the appearance of impartiality, defined in *White* as a lack of bias for or against either party to a proceeding). Although the judicial conduct provision at issue in *Dunleavy* focused on prohibiting judges from soliciting funds for a political organization or candidate, we believe such prohibitions are analogous to the endorsement clause at issue in this case. Like the court in *Dunleavy,* we also conclude that our endorsement clause is intended to promote what we believe is an undeniable compelling state interest in promoting the reality and appearance of impartiality of our judiciary, which in this case means eliminating the potential for bias or the appearance of bias for or against the parties appearing before a judge.

{12} Having concluded that the compelling state interest of judicial impartiality and its appearance is at issue in this case, *White* would have us determine whether our endorsement clause is narrowly tailored to serve that compelling state interest. In undertaking this same inquiry, the court in *Dunleavy* noted that the solicitation of political contributions by a judge on behalf of other political candidates is the exact type of "activity that potentially creates a bias, or at least the appearance of bias, for or against a party to a proceeding." *Id.,* 838 A.2d at 351. Similarly, in our case, the prohibition against judges making political endorsements is purposefully designed to preclude judges from engaging in conduct that has the potential for creating bias or the appearance of bias for or against a party to a proceeding. Under the specific facts of this case, Respondent's endorsement of Mayor Standley for reelection would certainly create the appearance of bias were the mayor or anyone associated with his administration to appear before Respondent in an actual case. In short, as underscored by the potential damage caused by Respondent's actions, our endorsement

clause is narrowly tailored to serve the State's compelling interest in a judiciary that is both impartial in fact and in appearance.

{13} In a similar case arising in New York, a judge was disciplined for, among other things, violating an endorsement clause very similar to our own by calling prospective voters to encourage them to vote for a particular legislative candidate, even though he did not give his name or identify himself as a judge during the calls. *Raab*, 763 N.Y.S.2d 213, 793 N.E.2d at 1288. Consistent with the views we express here today, the New York Court of Appeals rejected the judge's reliance on *White* to argue that the endorsement clause violated his First Amendment rights. While recognizing that judges who are subject to election have certain free speech rights, and that the electorate has the right to make an informed decision about how to vote, the court in *Raab* also noted that it must consider the State's compelling interest in preserving impartiality, and the appearance of impartiality, in the judiciary. *Id.* 763 N.Y.S.2d 213, 793 N.E.2d at 1290–91.

{14} The *Raab* court also rejected the judge's claim that the endorsement clause was not narrowly tailored to serve the State's compelling interest in an impartial judiciary. In particular, the court noted that its judicial conduct rules struck a delicate balance between permitting judicial candidates to engage in certain political activities related to their own campaigns, while prohibiting judicial candidates and judges from supporting other candidates or political party objectives. *Id.* 763 N.Y.S.2d 213, 793 N.E.2d at 1292–93. Because of the heightened risk that a judicial candidate could be perceived as being beholden to a particular political leader or party after becoming a judge, the court concluded that the endorsement clause was carefully and narrowly designed to alleviate this concern and promote "the State's compelling interest in preventing political bias or corruption, or the appearance of political bias or corruption, in its judiciary." *Id.* 763 N.Y.S.2d 213, 793 N.E.2d at 1293; *accord In re Code of Judicial Conduct*, 603 So.2d 494 (Fla.1992). We believe the same can be said of our endorsement clause.

■ {15} During oral argument before this Court, Respondent suggested that our endorsement clause was not narrowly drawn to promote impartiality and the appearance of impartiality because our Code of Judicial Conduct does not prohibit other conduct that could undermine impartiality and the appearance of impartiality within the judiciary, namely, monetary contributions to political organizations. *See* Rule 21–700(A)(2)(c) (permitting a judge to contribute to a political organization unless otherwise prohibited by law). We recognize that for a challenged provision to be narrowly tailored to serve a compelling state interest under a strict scrutiny analysis, it must not be under-inclusive. *See White*, 536 U.S. at 775, 779–80, 122 S.Ct. 2528. That is, our endorsement clause cannot be deemed narrowly tailored to serve the compelling state interest of an impartial judiciary if it does not prohibit a judge from engaging in other similar conduct that threatens judicial impartiality or the appearance of impartiality.

{16} In assessing whether our endorsement clause is so narrowly tailored as to survive strict scrutiny, we must stay focused on the particular conduct that the endorsement clause prohibits, and we should not view the endorsement clause in isolation from the rest of our Code of Judicial Conduct. In this regard, it is apparent that the purpose of the endorsement clause and the other provisions of Rule 21–700(A)(3) is to prohibit a judge from making public statements of support for a particular political candidate or organization. As noted above, this prohibition serves the State's compelling interest in the appearance of judicial impartiality. Although Rule 21–700(A)(2)(c) may not prohibit a sitting judge from contributing to a political organization, such an act by a judge should not be likened to the high-profile show of support that is embodied in a public endorsement published in a newspaper. It is apparent that making contributions to a political candidate or organization may implicate the judge's impartiality if that candidate or organization later comes before the judge in a particular case. However, in such a case, another provision in our Code of Judicial Conduct would require the judge to recuse from such a proceeding if "the judge's

impartiality might reasonably be questioned." *See* Rule 21–400(A) NMRA; *see also White*, 536 U.S. at 794, 122 S.Ct. 2528 (Kennedy, J., concurring). A judge's private contribution or private support for a candidate does not risk damaging the appearance of impartiality in the same way that a public endorsement does.

{17} It is the public pronouncement of support that most offends our notions of impartiality. A private promise of support to a candidate, like a private contribution of money, creates less of a perception of partiality. A public endorsement, like an advertised monetary contribution, hits closest to the mark. Our Code of Judicial Conduct aims only at public conduct that creates the highest degree of risk.

■ {18} In short, taken as a whole, our Code of Judicial Conduct, which includes the endorsement clause at issue in this case, is carefully and narrowly drawn to serve the compelling state interest in a judiciary that is impartial in fact and in appearance. Accordingly, even assuming that *White* does apply in this case, we conclude that our endorsement clause would survive strict scrutiny. Having concluded that Respondent's endorsement of Mayor Standley for reelection may be constitutionally prohibited under the terms of Rule 21–700(A)(3)(b), we now explain why Respondent's conduct warrants this formal reprimand.

{19} As the record reflects in this case, Respondent was previously admonished by the chief district court judge of the Eleventh Judicial District for publicly endorsing a candidate for political office. This Court also has previously issued a formal reprimand to Respondent for running afoul of other limitations on the political activity of a judge. Viewed as a whole, Respondent's conduct demonstrates a pattern of knowingly violating Code provisions prohibiting political activity by a judge.

{20} As the Supreme Court of Iowa correctly recognized when considering similar ethical violations by a judge in that state:

> The strength of our judicial system is due in large part to its independence and neutrality. These twin qualities help re-move outside influences from judicial decision-making, and promote public respect and confidence in our system of justice. Yet, judicial independence does not come without some personal sacrifice by judges. Judicial independence and neutrality require judges to limit or abstain from involvement in a variety of activities commonly enjoyed by others in the community, including politics.

*In re Inquiry Concerning McCormick*, 639 N.W.2d 12, 15 (Iowa 2002) (citations omitted).

{21} As has been frequently recognized, including in *White*, a judge does not shed all constitutional rights when becoming a judge. However, "[j]udges hold a unique position in society, and with that position comes the unique power and responsibility of administering justice." *See Glickstein*, 620 So.2d at 1002. When a judge fails to recognize and properly exercise that "unique power and responsibility," that judge endangers our entire system of justice. As one commentator has so perceptively noted:

> The great mass of the people think that judges are different, that their special relationship to the law is what makes them different, that they are not merely political authorities, weighing and balancing interests, but legal authorities, guided and restrained by the law. It is this conviction, more than anything else, which compels the people to obey orders of the court. It is this conviction, more than anything else, which gives judges a power and authority that so resembles political power that they mistakenly think they are political people. Paradoxical as it may seem, to the extent that judges are seen as political rather than judicial, to that extent they lose their authority and the power they now have to induce obedience to their orders. If judges are stripped of the robes of the law—or if, in the foolish pursuit of political power, they strip themselves of the robes of the law—the people will cease to accept the authority of court decisions, law enforcement officers will be less ready to enforce court orders, legislators will be more ready to curb judicial powers, and the judges will wonder where their power went.

*See In re Code of Judicial Conduct,* 603 So.2d at 497–98 (quoting Robert A. Goldwin, *Comments to Chapter 1, in The Judiciary in a Democratic Society* 19–20 (Leonard J. Theberge ed., 1979)) (internal quotation marks omitted).

## CONCLUSION

{22} In light of the foregoing, we formally reprimand Respondent for publicly endorsing a candidate for public office in violation of Rule 21–700(A)(3)(b). We therefore need not consider whether Respondent's actions also lent the prestige of his judicial office to advance the private interest of another in violation of Rule 21–200(B). Suffice it to say, however, that Respondent should remain mindful of this formal reprimand whenever he is tempted to enter the political fray in the future.

{23} **IT IS SO ORDERED.**